KILEY, Respondent, vs. CHICAGO, MILWAUKEE & ST. PAUL
RAILWAY COMPANY, Appellant.

*November 11, 1908—March 9, 1909.*

*Constitutional law: Equal protection of the laws: Due process of law:
Corporations: "Persons:" Classification for legislative purposes:
Railroad companies: Liability for injuries to employees: Ques-
tions for jury: Depriving courts of judicial power: Statutes:
Partial invalidity: Police power: Contributory negligence: Com-
parative negligence.: Liberty of contract: Injuries in other
states.*

1. Corporations are entitled to the same protection as individuals
   under the constitutional guaranties of liberty and equality, and
   are "persons," within the meaning of the XIVth amendment,
   Const. of U. S., providing that no state shall deprive any per-
   son of property without due process of law or deny to any per-
   son the equal protection of the laws.
2. The rule of equality before the law does not preclude classifica-
   tion for legislative purposes, if the classification is not arbitrary
   but is based upon substantial distinctions, is germane to the
   purpose of the law, is not based on existing circumstances only
   so· that there can be no change in the membership of a class,
   and provided the law applies equally to all members of each
   class.
3. The necessity and propriety of such classification are to be de-
   termined by the legislature, and if made in conformity with the
   rules above mentioned it cannot be disturbed by the courts.
4. The business of operating a railroad differs from others in its
   nature, in its relation to the public, and in its peculiar dangers
   to employees and to the public, so as to justify special regula-
   tion, and to that end the separation of railroad companies into
   a class for purposes of legislation having for its object the pro-
   tection of their employees and the safety of the public.
5. Ch. 254, Laws of 1907,—amending sec. 1816, Stats. (1898), and
   imposing upon every railroad company liability for all injuries.
   sustained by any employee thereof (except employees working
   in 'shops and offices) while engaged in the line of his duty as
   such, caused in whole or in greater part by negligence of any
   other employee of such company,—is designed to enforce greater
   care on the part of the companies in the selection of employees,
   and thereby to secure not only protection for the employees but.
   the safety of the public, and is not invalid under the constitu-
   tional guaranties as to due process of law and equal protection.
   of the laws.

6. It is not essential to the validity of such legislation that its operation should be confined to employees actually engaged in operating trains or incurring risks peculiar to the railroad business,—the special regulation having reference to railroad companies as a class, and not necessarily to any particular class of employees.

7. Office and shop employees of railroad companies are sufficiently distinct in their employment and relation to the conduct of the business to justify the legislature, within the field of its discretion and with regard to public policy, in exempting them from the operation of the law.

8. Subd. 5 of said sec. 1816, Stats., as amended by ch. 254, Laws of 1907 (providing that "in all cases under this act the question of negligence and contributory negligence shall be for the jury"), is merely declaratory of the law as it existed, namely, that when the court has found that there is legal evidence tending to show negligence or contributory negligence it is for the jury to determine from the evidence adduced whether negligence or contributory negligence in fact existed. It does not, therefore, deprive the courts of any judicial power vested in them by the constitution (art. VII, sec. 2).

9. Even if said subd. 5 were construed as conferring judicial power upon juries its invalidity would not render the other portions of the act invalid, it being a separate and distinct provision, not the compensation for or inducement to the enactment of such other portions.

10. Subd. 3, 4, of said sec. 1816 (providing, in effect, that contributory negligence of the injured employee shall be no bar to a recovery if the negligence of the company or other employee contributed in a greater degree to the injury) are within the legislative power of police regulation, and cannot be held so arbitrary and unreasonable as to be invalid under the constitutional guaranties of equal protection and due process of law.

11. Subd. 6 of said sec. 1816 (providing that no contract, rule, or regulation shall exempt a railroad company from the full liability imposed by the act) is a proper provision, within the discretion of the legislature, to secure to employees the benefits of the rights created, and does not unduly infringe the company's right to liberty of contract.

12. Subd. 8 of said sec. 1816 (which seeks to extend the rights and liabilities created by the act to cases where the injuries were received in another state if the contract of employment was made in this state) deals with a subject independent of and severable from the other parts of the act, and if invalid does not render the whole law invalid. [Whether said subd. 8 is invalid or not is not determined.]

MARSHALL, J., dissents.

APPEAL from an order of the circuit court for Brown county: S. D. HASTINGS, Circuit Judge. *Affirmed:*

Plaintiff brings this action for the recovery of the damages alleged to have been suffered by reason of the loss of an eye and the physician's and nursing bills incurred as the result of an injury which he claims was due to the negligent and careless manner in which other employees of the defendant performed their duties. On July 2, 1907, plaintiff was engaged with other employees of the defendant in the construction of a wire fence along the defendant's right of way. The company's foreman had directed them to take certain wire off an old fence. The wire was held in place by staples and these were to be pulled out. Plaintiff was advancing toward a fence post with a hammer, intending to pull out the staples, when two of 'the other employees, by pulling upon the wire, pulled a staple out of the post. The staple flew into the air, struck plaintiff in his right eye, and blinded him. The action is brought under ch. 254, Laws of 1907. The court overruled defendant's demurrer to the complaint. This is an appeal from the order of the court overruling the demurrer and allowing the defendant to answer within twenty days upon the usual terms.

*H. O. Fairchild,* attorney, and *Burton Hanson,* of counsel, for the appellant.

For the respondent there was a brief by *Minahan & Minahan,* and oral argument by *V. I. Minahan.*

The following opinion was filed January 5, 1909:

SIEBECKER, J. Plaintiff's right to recover on the alleged cause of action is founded on the provisions of sec. 1816, Stats. (1898), as amended by ch. 254, Laws of 1907. There is no claim that the facts alleged in his complaint constitute a cause of action against the defendant at common law or under sec. 1816, Stats. (1898), as it stood prior to its amendment by ch. 254, Laws of 1907. The lower court sustained the complaint upon the ground that sec. 1816, Stats. (1898),

in its amended form is valid.    The defendant avers that the
amended statute creates liabilities and imposes burdens which
are forbidden by secs. 1, 9, 13, 22, art. I, of the state consti-
tution and by the XIVth amendment to the federal constitu-
tion.    The alleged obnoxious provisions of the statute were
added by the amendatory act, which is embraced in ch. 254,
Laws of 1907.    It is therefore contended, if this act is in-
valid, that the provisions of sec. 1816, Stats. (1898), as it
stood prior to such amendment, are still in force as the law
on the subject.    The provisions of ch. 254, Laws of 1907,
are assailed as invalid legislation upon several grounds.

It is first contended that the enacting part of this chapter
and subd. 1, 2, and 9 must read together, and that when so
considered the act is unconstitutional because it denies to rail-
road companies equal protection and due process of law.
These provisions are:

"Every railroad company shall be liable for damages for
all injuries, whether resulting in death or not, sustained by
any of its employees, subject to the provisions hereinafter
contained regarding contributory negligence on the part of
the injured employee:

"(1) When such injury is caused by a defect in any loco-
motive, engine, car, rail, track, roadbed, machinery or appli-
ance used by its employees in and about the business of their
employment.

"(2) When such injury shall have been sustained by any
officer, agent, servant or employee of such company, while en-
gaged in the line of his duty as such and which such injury
shall have been caused in whole or in greater part by the neg-
ligence of any other officer, agent, servant or employee of such
company in the discharge of, or by reason of failure to dis-
charge, his duty as such."

"(9) The provisions of this act shall not apply to em-
ployees working in shops and offices."

There is no controversy raised as to the rights of persons
under the provisions of the state and federal constitutions
guaranteeing to all persons the equal protection and due

process of law. It is, however, contended that the legislature had no power to impose on railroad corporations only the burdens and liabilities embraced in this statute, and thus to exempt all other corporations, persons, and associations from these burdens and liabilities. Appellant's chief contention is that this legislation is discriminatory against railroad companies and violates both the state and federal constitutions forbidding arbitrary and special legislation and the constitutional guaranties of due process and equal protection of the laws. It is said that corporations are entitled to the rights of a person within these constitutional guaranties of liberty and equality and that they are afforded the same protection as individuals against an invasion of these rights. They must be granted equal means and equal access to the courts. for the protection of their rights, and the imposition of burdens, liabilities, and charges which are not imposed on all others under the same circumstances is forbidden. These rights of corporations were recently recognized in the case of *Phipps v. Wis. Cent. R. Co.* 133 Wis. 153, 113 N. W. 456. As declared in the opinion of the court in *Covington & L. T. R. Co. v. Sandford,* 164 U. S. 578, 592, 17 Sup. Ct. 203 :

"It is now settled that corporations are persons within the meaning of the constitutional provisions forbidding the deprivation of property without due process of law, as well as a denial of the equal protection of the laws" (citing cases).

Since, then, the railroad company, which is the defendant, under these constitutional provisions is protected as an individual in its rights, the question recurs, Do the provisions of ch. 254, Laws of 1907, violate these rights? As this court stated in the *Phipps Case:*

"When by statute a person, natural or artificial, is denied an equal remedy in the law or equal protection in the courts, such statute is void [citing]. To this broad rule of equality of all persons before the law is the exception of the right un-

der certain circumstances of proper classification, but this classification must be reasonable and based upon certain rules which bear a just relation to the act in respect to which the classification is made [citing]."

That such classification must be based upon substantial distinctions, be germane to the purpose, cannot rest on existing circumstances only, nor preclude additions to those included in the class, and must apply equally to all within, received full elaboration in that case and the cases there collated and need not be repeated here. The power of classification for legislative purposes has existed at all times as an incident of legislative power, and exists now unless expressly forbidden by the constitution. It is also well recognized that the necessity and propriety of such classification are to be determined by the legislative branch of the government and cannot be disturbed when exercised within the limitations imposed. We must then determine whether the legislature by this legislation has violated accepted rules of classification.

The statute imposes liabilities on railroad companies for all injuries sustained by any of its officers, agents, servants, or employees while in the performance of their duties, which may be caused, in whole or in greater part, by the negligence of other officers, agents, servants, or employees, those working in shops and offices being excepted. It is strenuously urged that the imposition of these burdens and liabilities on railroad companies only, as a class, violates their right to the equal protection of the law, and that, being a classification based upon the character of the corporation, it furnishes no reasonable distinction or necessity for separating them into a class for purposes of legislation. To ascertain wherein distinction is made by the legislature between railroad companies and individuals and other corporations and associations we must consider the nature and object of the regulation as well as the provisions prescribing rules for the regulation of railroad companies as a class. The context of this statute shows that railroad companies are separated into a class for legislative regulation respecting their liability to

Kiley v. Chicago, M. & St. P. R. Co. 138 Wis. 215.

their employees for injuries caused by their negligence or the negligence of other employees in the course of their employment. Is the railroad business distinguished in character from all other businesses so as to justify special regulation of it, as is done by this law? This we think must be answered in the affirmative. The business of operating a railroad differs from others in its nature, in its relation to the public, and in the peculiar dangers and hazards as regards its employees and the public. These characteristics clearly distinguish the railroad from any other business and call for regulation to meet the conditions and exigencies peculiar to it and such as are wholly inapplicable to any other business. The object of this law is to attain reasonable protection to its employees and to secure the safety of the public. The legislature seeks to attain this through the imposition of these unusual burdens and liabilities, thereby securing from railroad companies the exercise of a degree of care in the selection of competent and careful employees for the conduct of the business commensurate with the hazards and dangers to its employees and the insecurity of the public. Securing the safety of the public, in addition to the protection of its employees, is an important feature which distinguishes a railroad business from any other, and is an important consideration in separating railroads into a class by themselves for legislative purposes. The following cases, selected from many others, are authorities holding statutes similar to that contained in ch. 254, Laws of 1907, valid within the provisions of the state and federal constitutions guaranteeing equal protection and due process of law:

In the case of *Mo. Pac. R. Co. v. Mackey,* 127 U. S. 205, 8 Sup. Ct. 1161, the court considered a Kansas statute which enacted that:

"Every railroad company . . . shall be liable for all damages done to any employee of such company in consequence of any negligence of its agents, or by any mismanagement of its engineers or other employees, to any person sustaining such damage."

In considering the claim that it was unconstitutional legislation the court says:

"It [the claim] seems to rest upon the theory that legislation which is special in its character is necessarily within the constitutional inhibition; but nothing can be further from the fact. The greater part of all legislation is special, either in the objects sought to be attained by it or in the extent of its application. . . . And when legislation applies to particular bodies or associations, imposing upon them additional liabilities, it is not open to the objection that it denies to them the equal protection of the laws if all persons brought under its influence are treated alike under the same conditions. . . . It is conceded that corporations are persons within the meaning of the amendment [citing]. But the hazardous character of the business of operating a railway would seem to call for special legislation with respect to railroad corporations, having for its object the protection of their employees as well as the safety of the public. The business of other corporations is not subject to similar dangers to their employees, and no objections, therefore, can be made to the legislation on the ground of its making an unjust discrimination. It meets a particular necessity, and all railroad corporations are, without distinction, made subject to the same liabilities. As said by the court below, it is simply a question of legislative discretion whether the same liabilities shall be applied to carriers by canal and stage coaches and to persons and corporations using steam in manufactories."

In *Tullis v. L. E. & W. R. Co.* 175 U. S. 348, 20 Sup. Ct. 136, the court had under consideration the validity of an act of the Indiana legislature providing that railroad companies should be liable for injuries to their employees resulting from the negligence of fellow-servants. The provisions of the act extended to the same class of railroad employees as the act now before us and was attacked in the federal court upon similar grounds, but the court held that it was proper to treat railroads as a class by themselves for the purposes of such regulation, and that it was a valid enactment, reaffirming the doctrine of the *Mackey* and other cases upholding

similar statutes of the states of Iowa and Ohio.   See *Minne-apolis & St. L. R. Co. v. Herrick,* 127 U. S. 210, 8 Sup. Ct. 1176; *Chicago, K. & W. R. Co. v. Pontius,* 157 U. S. 209, 15 Sup. Ct. 585; *Peirce v. Van Dusen,* 78 Fed. 693, 47 U. S. App. 339.

Recurring to this class of legislation in our state, we find the first enactment was embodied in ch. 173, Laws of 1875, under which railroad companies were made liable "for all damages sustained within this state by any employee, servant or agent of such company while in the line of his duty as such, and which shall have been caused by the carelessness or neg-ligence of any other agent, employee or servant," and that no contract, receipt, rule, or regulation should exempt the com-pany from such liability.   In the case of *Ditberner v. C., M. & St. P. R. Co.* 47 Wis. 138, 2 N. W. 69, this court held that this statute was not obnoxious to the constitutional provision prohibiting unequal and partial legislation on general sub-jects.   The court expressly rejects the views expressed in the opinion of the Iowa court (*Deppe v. C., R. I. & P. R. Co.* 36 Iowa, 52) respecting the proper basis of classification, and sustains the law, though it found that it was not re-stricted in its operation to such injuries as were sustained from the negligent operation of railway trains.   The court there rejected the holding of the Iowa court which so re-stricted the application of the statute.   In the light of this declaration we do not deem it necessary to further consider the Iowa case as an authoritative construction of our early statute.

It is contended that the true basis of classification is the one declared by the court in *Lavallee v. St. P., M. & M. R. Co.* 40 Minn. 249, 41 N. W. 974, which in effect declares that the reason for treating railroad companies as a separate class for regulations of the nature of those embraced in the law under consideration is based on the peculiar hazards to employees incident to "the use and operation of railroads,"

and that it is restricted to those whose injuries are the "result of such dangers." *Johnson v. St. P. & D. R. Co.* 43. Minn. 222, 45 N. W. 156. As we have shown, the ground for classifying railroads separately for the purposes of such legislation is not only to protect the employees against the peculiar dangers and hazards incident to the operation of the railroad, but also the security of the public.

The exemption of shop and office employees from the operation of the law seems an appropriate one, because they are not engaged in that part of the business which exposes them to the unusual dangers and hazards of the business; nor does their conduct bear so directly in securing the safety of the public. It is suggested that this exemption is improper because these employees may be subjected to hazards or perils equally dangerous to those to which other employees are subjected. Conceding that this may be true, still that would not invalidate the classification. We do not find the legislative power to classify confined within such narrow limits. As declared by this court in *State v. Evans,* 130 Wis. 381, 110 N. W. 241:

"Each new exercise of the power of police regulation presents anew to the courts the question of possible relationship between the distinguishing characteristics of the classes and the object and purposes of the regulation. As to the cogency or propriety of either the regulations made or of the importance of the distinctions . . . the courts have little concern. Those subjects rest with the legislature, and only when the court . . . is compelled to say that no one, in the exercise of human reason and discretion, could honestly reach a conclusion that distinctions exist having any relation to the purpose and policy of the legislation can it deny it validity [citing]."

Nor are distinctions between individuals of one class and of another the criteria merely of a classification.

"The question to be considered, however, is the distinction between the classes as classes, whether there are character-

istics which, in a greater degree, persist through the one class than in the other, which justify legal discrimination between them [citing]."   ·

We are of opinion that the office and shop employees are sufficiently distinct in their employment and relation to the conduct of the railroad business to justify the legislature, within the field of its discretion and with regard to public policy, in exempting them from the operation of the law. *Chicago, K. & W. R. Co. v. Pontius,* 157 U. S. 209, 15 Sup. Ct. 585; *Minneapolis & St. L. R. Co. v. Herrick,* 127 U. S. 210, 8 Sup. Ct. 1176; *Callahan v. St. Louis M. B. T. R. Co.* 170 Mo. 473, 71 S. W. 208; *Pittsburgh, C., C. & St. L. R. Co. v. Montgomery,* 152 Ind. 1, 49 N. E. 582; *Georgia R. & B. R. Co. v. Miller,* 90 Ga. 571, 16 S. E. 939; *Atchison, T. & S. F. R. Co. v. Matthews,* 174 U. S. 96, 19 Sup. Ct. 609; *Employers' Liability Cases,* 207 U. S. 463, 28 Sup. Ct. 141.

It is contended that the legislature intended to deprive the courts of their judicial functions, as conferred on them by sec. 2, art. VII, of the state constitution, by the provisions of subd. 5 of sec. 1816, as amended, and to confer such functions on juries, as they are constituted by the state constitution. The powers conferred on courts and juries by these constitutional provisions were well defined in the established system of jurisprudence in this country at the time of their adoption. This court interpreted these constitutional provisions as conferring on court and jury those well-defined powers as they existed and had been repeatedly exercised by court and jury under the common law. In *Callanan v. Judd,* 23 Wis. 343, in speaking of the significance of the phrase "judicial power as to matters of law and equity," employed in the constitution, as applied to the courts, the court declares:

"In actions at law they had the power of determining questions of law, and were required to submit questions of fact to a jury. When the constitution, therefore, vested in cer-

tain courts judicial power in matters at law, this would be construed as vesting such power as the courts, under the English and American system of jurisprudence, had always exercised in that class of actions. It would not import that they were to decide questions of fact, because such was not the judicial power in such actions. And the constitution does not attempt to define judicial power in these matters, but speaks of it as a thing existing and understood."

See, also, *Oatman v. Bond,* 15 Wis. 20; *Klein v. Valerius,* 87 Wis. 54, 57 N. W. 1112; *Janesville v. Carpenter,* 77 Wis. 288, 46 N. W. 128.

Under the system of law as it then existed it devolved on the court to determine the legal sufficiency of the evidence tending to prove a fact; and when the court had judicially ascertained that the evidence adduced tended to establish the constituent facts of the matter at issue, it then devolved on the jury to determine whether, upon the evidence, the fact was satisfactorily proven. The powers of the court and jury in the administration of the law in these respects were distinct and well defined at the time of the adoption of our constitution and became vested in the court and jury by its provisions. They cannot be abrogated or modified by legislative action to the extent of impairing, in any degree, the judicial power. Under the constitution courts have become vested with the judicial power to determine the questions of the legal sufficiency of the evidence to establish the rights of the parties at issue and to apply the law to the facts when found, and this power cannot be withdrawn from them and conferred on juries.

Did the legislature intend by the provisions of subd. 5 of sec. 1816, as amended, to confer judicial power, vested in the court, on the jury? It declares: "In all cases under this act the question of negligence and contributory negligence shall be for the jury." In their general sense the words are but a declaration of the law as it exists, namely, that when

the court has found that there is legal evidence tending to show negligence or contributory negligence, it is for the jury to determine from the evidence adduced whether negligence or contributory negligence exists.   This interpretation of the provision does not make a change in the law and cannot affect the rights of any person.   It is, however, asserted that if the phraseology of this provision be considered in connection with other parts of the law which pertain to the duties of the jury in these cases and the general purpose and object of the act, it is apparent that the legislature intended to confer on juries the judicial power to determine the legal sufficiency of the evidence offered as tending to establish negligence or contributory negligence in the case.   It is claimed that this idea is supported by the language of subd. 3, declaring:

"In every action to recover for such injury the court shall submit to the jury the following questions: First, whether the company, or any officer, agent, servant or employee other than the person injured was guilty of negligence directly contributing to the injury; second, if that question is answered in the affirmative, whether the person injured was guilty of any negligence which directly contributed to the injury; third, if that question is answered in the affirmative, whether the negligence of the party so injured was slighter or greater as a contributing cause to the injury than that of the company, or any officer, agent, servant or employee other than the person so injured; and such other questions as may be necessary."

We do not find this claim to be well supported, and incline to the view that subd. 5 is merely declaratory of the law as it existed.   If, however, it be assumed that the legislature intended to confer judicial power on juries, such as we have shown is inhibited by the constitution and such as would render this subdivision void, still this view of the subdivision does not necessarily render the whole act void, for we are persuaded that such invalid part cannot affect the validity of

the other parts of the law.    It is a separate and distinct pro-
vision, and if removed from the law leaves the other sections
a complete and perfect regulation of the subject.    It is mani-
fest that the other provisions regulating the rights and reme-
dies of the parties express the fundamental and dominant
purpose of the legislature, and that this part, if void, was not
the compensation for or the inducement to the enactment of
the valid portions.    The provisions of subd. 5 cover an inde-
pendent subject, and can be completely severed and removed
from the other provisions without causing any change in
them or in their operative effect.    Under such circumstances
the invalid part of a statute should be dropped out and the
valid portions retained and held effective.    We, however,
conclude that subd. 5 is merely declaratory of the law.    No
judicial power is therefore conferred on juries, and hence it
cannot affect the validity of the other provisions of the law.
*State ex rel. Cornish v. Tuttle,* 53 Wis. 45, 9 N. W. 791;
*State ex rel. Chandler v. Main,* 16 Wis. 398; *Quiggle v. Her-
man,* 131 Wis. 379, 111 N. W. 479; *Ill. Cent. R. Co. v. Mc-
Kendree,* 203 U. S. 514, 27 Sup. Ct. 153.

The point is made that the provisions of subd. 3 and 4
are arbitrary and discriminatory in their effect, confer spe-
cial favors on employees, and impose unjust burdens upon
and discriminate against the rights of railroad companies, and
they therefore are repugnant to the principle of equal pro-
tection and due process of law.    The rights and liabilities
created by a law fixing liabilities for injuries to servants
through the negligence of the railroad company or of co-
employees and regulating the amount of recovery are within
the legislative power of police regulation, and in the forego-
ing and other cases have been approved in many respects as
appropriate and reasonable.    The necessity and reasonable-
ness and the propriety of the regulations prescribed all rest
in the legislative judgment to such an extent that we cannot
say that such authority has been arbitrarily and unreasonably

exercised in the act before us. In *Quackenbush v. Wis. &
M. R. Co.* 62 Wis. 411, 29 N. W. 519, in passing upon the
validity of a statute which excluded the defense of contribu-
tory negligence to an action for damages occasioned through
the want of fencing the railway right of way, this court said:

"It is doubtless true that the provision imposes an absolute
liability in such a case. It certainly excludes the defense of
contributory negligence where the corporation fails to per-
form the duty which the statute prescribes in the first in-
stance. This is in the nature of a penalty for the neglect of
the corporation to conform to a regulation which the legisla-
ture seems to consider essential for the protection of life and
property. We think there can be no doubt but such laws fall
within the police power. Whether the rule of absolute lia-
bility in such a case is founded in wisdom and sound public
policy is not for the courts to decide."

See, also, *Quackenbush v. Wis. & M. R. Co.* 71 Wis. 472,
37 N. W. 837; *Employers' Liability Cases,* 207 U. S. 463,
28 Sup. Ct. 141.

The provisions of subd. 6 are assailed as invalid upon the
ground that it attempts to deprive railroads of the right of
liberty to contract with their servants for exemption from the
liability imposed by the act. This subdivision enacts that:

"No contract or receipt between any employee and a rail-
road company, no rule or regulation promulgated or adopted
by such company, and no contract, rule or regulation in re-
gard to any notice to be given by such employee shall exempt
such corporation from the full liability imposed by this act."

The railroad employers' liability act of 1875 (ch. 173,
Laws of 1875), considered in *Ditberner v. C., M. & St. P. R.
Co.* 47 Wis. 138, 2 N. W. 69, provided that no contract, rule,
or regulation between an employee and the company for ex-
empting the company from the liability imposed should be
effective as between the parties. These provisions have ob-
tained substantially as part of the law during the periods the
various statutes on the subject have been in force. The pur-

pose of these provisions obviously is to prohibit the company from effecting an abrogation of the liabilities created by the statute and to preserve these rights for the benefit of the employees. The legislature having created a right, it may, within its discretion, make provision against the deprivation and the impairment of the benefits arising under it, if in so doing the interested parties are not deprived of some constitutional right or privilege. The claim that the statute is an interference with the companies' constitutional right of liberty of contract does not give effect to important limitations on that right which are fully established in the adjudications. In *Frisbie v. U. S.* 157 U. S. 160, 15 Sup. Ct. 586, the court states:

"While it may be conceded that, generally speaking, among the inalienable rights of the citizen is that of the liberty of contract, yet such liberty is not absolute and universal. It is within the undoubted power of government to restrain some individuals from all contracts, as well as all individuals from some contracts. It may deny to all the right to contract for the purchase or sale of lottery tickets; to the minor the right to assume any obligations, except for the necessaries of existence; to the common carrier the power to make any contract releasing himself from negligence, and indeed may restrain all engaged in any employment from any contract in the course of that employment which is against public policy. The possession of this power by government in no manner conflicts with the proposition that, generally speaking, every citizen has a right freely to contract for the price of his labor, services, or property." See, also, *Patterson v. Bark Eudora,* 190 U. S. 169, 23 Sup. Ct. 821.

This clearly recognizes the power of the legislature to restrict the right of abrogating by contract the duty or to impair the benefit created by it. To deny the legislature this power would result in a denial to it of power to prohibit persons from contracting against what it declares to be public policy. In the following cases the power of the legislature to restrict the liberty of contracting respecting rights

created by it, which in their nature and origin were akin to
the rights created by the statute before us, was upheld:
*Holden v. Hardy,* 169 U. S. 366, 18 Sup. Ct. 383; *Frisbie
v. U. S., supra; Smiley v. Kansas,* 196 U. S. 447, 25 Sup.
Ct. 289; *State v. Brown & S. Mfg. Co.* 18 R. I. 16, 25 Atl.
246; *Knoxville I. Co. v. Harbison,* 183 U. S. 13, 22 Sup. Ct.
1; *Kilpatrick v. G. T. R. Co.* 74 Vt. 288, 52 Atl. 531; *Mc-
Guire v. C., B. & Q. R. Co.* 131 Iowa, 340, 108 N. W. 902.

It is manifest from these adjudications that the object of
the law in creating these liabilities is a subject of police regu-
lation, not only for the benefit of employees, but also for the
protection of life, person, and property, and therefore it has
its reason and foundation in public necessity and policy.
The provisions of subd. 6 under this doctrine do not unduly
infringe appellant's right of liberty of contract. The inhi-
bition is a proper regulation to secure the benefits of the
rights created, and serves to promote the security of the pub-
lic by causing a more careful selection of competent servants
and an improved enforcement of their duties.

We do not find that the provisions of subd. 8 of the act are
involved in the determination of this case, aside from its
bearing on the validity of the other parts of the act. This
subdivision seeks to extend the rights and liabilities created
by the act to injuries in other states under contracts made in
this state with employees. We are persuaded that the sub-
division deals with a subject wholly independent of the other
parts of the act and severable from them. We discover no
grounds for saying that this section was designed as compen-
sation for or inducement to the enactment of the other parts,
and that the legislature would not have enacted the other
parts without it. Under these circumstances it does not af-
fect the valid parts of the law. Hence we need not pass on
the question of its validity in this case and therefore we leave
it undecided.

The allegations show that the plaintiff was an employee of

the defendant and that he was not working in a shop or office
at the time he sustained the injury. It is alleged that his
injuries were sustained while engaged in the line of his duty
and that they were caused by the negligence of other em-
ployees of the defendant while in the discharge of their du-
ties. The facts alleged are sufficient to state a cause of ac-
tion under the statutes.

*By the Court.*—The order appealed from is affirmed.

The following opinion was filed February 5, 1909:

MARSHALL, J. (*dissenting*). The most important judicial
authority lodged in this court is that of passing upon the va-
lidity of legislative enactments. That great power is given
to the court by the constitution, as definitely, if not as ex-
pressly, as power is given to the legislature to enact laws.
In its special field the court is absolutely independent. It is
answerable only to the people as their will is seen in the
fundamental law. The power is not discretionary, now to
be exercised and then not to be, according as mere expediency
may seem to dictate. It is obligatory in character as to every
situation legitimately invoking its activity. It must be jeal-
ously guarded and courageously vindicated upon all proper
occasions, if our constitutional system of liberty is to endure.

Those who are wont to regard activity of the court's power
mentioned as an unwarrantable, or at least a regrettable, in-
terference with legislative authority, evince want of compre-
hension of our system of government or want of appreciation
of the broad scope of those constitutional limitations designed
to guard at all points every individual in the enjoyment of
every right essential to those fundamentals: "life, liberty,
and the pursuit of happiness" for which "governments are
instituted among men, deriving their just powers from the
consent of the governed."

The importance of our constitutional restraints and the

high prerogative power of applying them, is as progressive as is the need for regulation, to the end that such regulation may not overleap its legitimate boundaries and enter the domain of the destructive. It will be a sorry day for our country when the time comes, if it ever does,—let us hope and believe that it never will,—that the invincible weapon— the constitution,—vitalized by an independent and fearless judiciary, shall not efficiently bar excursions into the domain of unbridled interference with individual rights.

If that is more important to any one element in society than to another, it is the weakest, hence the most helpless. So it is of the highest importance to the public, and particularly to the most humble portion thereof, that courts should grapple, willingly and effectively, with every question presented for solution involving validity of legislation on constitutional grounds.

How wisely the fathers must have looked into the future, when—with the evident purpose of their language being regarded as a command from the body of the people to all in authority, so long as the constitution should endure—they penned the words: "The blessings of a free government can only be maintained by a firm adherence to justice, moderation, temperance, frugality and virtue, and by frequent recurrence to fundamental principles."

The saying that the court of last resort should willingly apply the test of constitutional limitations, is not to be taken as suggesting judicial desire or haste to declare that not law which has the form of law. In no case should the court enter upon any doubtful ground. It should accord to the coordinate department the highest consideration, not condemning its action so long as any reasonable basis can be discovered for upholding it, but if none can be discovered, not hesitating to put the stamp of judicial disapproval upon it.

The proper attitude indicated deserves, and will doubtless receive, in the end at least, the approbation of the people by

whom all power was delegated. The judicial disapproval does not 'nullify law, as the inconsiderate would say. It merely evidences that what is clothed in the mere habiliments of law is not law at all.

Those principles, more often declared in recent years than formerly, are not new. They were laid down by Chief Justice MARSHALL in *Marbury v. Madison,* 1 Cranch, 137, and other cases, where that eminent jurist, in the early days of our constitutional system, gave thereto that vitality essential to its efficiency. He said for the court:

"This original and supreme will organizes the government, and assigns to different departments their respective powers. . . . Those who framed written constitutions contemplated them as forming the fundamental and paramount law of the nation, and consequently the theory of every such government must be, that an act of the legislature repugnant to the constitution is void. . . . It is emphatically the province and duty of the judicial department to say what the law is. . . . If then courts are to regard the constitution; and the constitution is superior to any ordinary act of the legislature; the constitution, and not such ordinary act, must govern the case to which they both apply."

The idea "that courts must close their eyes on the constitution and see only the law" would give to "the legislature a practical and real omnipotence with the same breath which professes to restrict their powers within narrow limits. . . ." That it "would reduce to nothing what we have deemed the greatest improvement on political institutions—a written constitution—would of itself be sufficient, in America where written constitutions have been viewed with so much reverence, for rejecting the construction."

The foregoing observations are not indulged in because of any thought that my brethren, in this case, not appreciating the principles stated, have unduly bowed to legislative authority, paying too much heed to its judgment as to that reasonableness which must be regarded as the infallible test of

legitimacy of a police regulation. They have set the proper standard in that regard, but failed, in my humble opinion, respecting the question of fact as to what is reasonable beyond any fair doubt, basing their conclusion on misapprehension of the bearing of decided cases.

If this case could rest on the mere question of abstract right, from high moral ideals as to whether a person who is injured in the *quasi*-public work of operating a railroad should have his loss charged up to the industry as a whole, and so added to the cost of things to be consumed in the activities of life, no one would be more ready to take the side of the injured than the writer. Why such losses from an economic standpoint, and a humane view as well, regardless of any question of negligence, should not be treated as legitimate elements of the cost of production and distribution of products for human consumption, would be hard to say, satisfactorily, if at all. The question here is not what ought to be or might be under a different system than that of imposing liability for losses to employees through accidental injuries upon the nearest employers, but what is legitimate under the present system. My general observations are to meet the prejudice which I conceive exists in nonjudicial fields against limiting, by judicial disapproval, the extent of that system, upon constitutional grounds, showing that when duty calls for such disapproval there is no field of discretion within which the judge can operate, though, in the individual case and all of its class, one might wish for a system whereby the wounds of all the injured could be healed and the road now so broad and so frequently traveled to the zone of want, could be absolutely abolished.

The first question as to the constitutionality of the act of 1907 arises under the opening part of sec. 1816 and subd. 1, 2, and 9, quoted in the court's opinion, imposing extraordinary liability upon every railroad company for injuries "to any of its employees," regardless of the branch of service in

which they may be engaged, except "employees working in shops or offices." I make no question but that there may be classification as to risks and radical changes in common-law liabilities as to members of a particular class, but is a classification of employees of railroads proper which entirely ignores hazards peculiar to railroads, by including in the special group all persons engaged in cutting grass upon the railroad right of way, or building fences, or building bridges, or doing work of construction and engineering, or providing supplies, such as ties and many other things that might be mentioned, even employees in any subsidiary business that might be carried on in aid of the railroad business, an army of persons in the aggregate, having no connection whatever with the operating feature of a railroad, which only is characterized by special railroad risks, and excluding shop employees who are exposed to quite as much hazard of personal injury, and office employees who are as much exposed as many of the included subclasses? Is the mere character of the employer, by itself, a basis for classification, even then excluding a large subclass of employees laboring within, to some extent, the zone of special hazard, and including, as stated, an army of others as far removed from any special risk as employees in any ordinary business? True, the doctrine of classification has been carried by courts so far that the distinction between special and general legislation is very hard to discover, largely nullifying the safeguards against unequal legislation, but is it true that so arbitrary a classification as we have to deal with here is legitimate, under even the very liberal rules we have adopted?

If we, instead of tying closely to some definite rule, look to delusive expressions used in precedents here and there outside this state, not following their history back to discover what they are worth by the light of the real groundwork upon which they are based, and being governed by such groundwork rather than such expressions, which, looked at by them-

selves, would seem to have been used unconscious of the real premises, there will be no escape from a condition of "classification run mad" which means, in practical effect, no classification at all along definite lines, and the equality clauses of our constitution, state and national, designed to prevent class legislation, in the special sense, will be of no practical effect whatever.

True, courts have laid down as limitations of the power of classification these rules:

1. Classification cannot be arbitrary. It must be based upon substantial distinction which makes one class really different from another.

2. The classification must be germane to the purpose of the law.

3. The classification must not be based upon existing circumstances only, so as to preclude the class opening to let in or let out members.

4. The law must apply equally to members of each class.

5. The characteristics of each class must be so far different from those of others as to reasonably suggest at least the propriety, having regard for the public good, of substantially different legislation therefor. *State ex rel. Risch v. Trustees,* 121 Wis. 44, 98 N. W. 954; *Bingham v. Milwaukee Co.* 127 Wis. 344, 106 N. W. 1071; *Bloomer v. Bloomer,* 128 Wis. 297, 107 N. W. 974.

In applying these rules I fully appreciate they furnish only a very general test of what is legitimate, but, nevertheless, they are quite as certain a guide as this or any other court has been able to formulate. Obviously, as has been often said, whether any particular situation falls within their boundaries is a question of fact, and is, as well as the question of necessity or propriety of any proposed regulation, primarily for legislative solution, subject to interference by judicial authority only upon its appearing beyond all reasonable doubt that the boundaries of reasonableness have been over-

stepped. But the fact that the rules stated furnish only a general test, and that no better can be formulated, and the great importance of not extending the doctrine of classification beyond legitimate boundaries so as to practically nullify the safeguards against unequal legislation,—render it highly important that such general rules should be given a pretty definite and certain meaning, not to be regarded as elastic; leaving only questions of fact to be determined as regards whether a given situation falls within or without the general scope.

We also fully recognize that while classification must not be arbitrary, that has reference to the principles embodied in the rules, not to the boundary of any particular class. That must, of necessity, be definite and in that sense arbitrary.

Again, we fully appreciate that the rule that classification must be based upon characteristics making the particular group so far different from others as to reasonably suggest need for or propriety of special legislative treatment, has reference to the group as such, regardless of whether each and every subject within the group has such characteristics to the same degree as every other subject, or not. But the dominant feature in some perceptible degree must affect substantially all. As said in *Nichols v. Walter,* 37 Minn. 264, 33 N. W. 800, and often quoted with approval here:

There must be "some apparent natural reason—some reason suggested by necessity, by such a difference in the situation and circumstances of the subjects placed in different classes as suggests the necessity or propriety of different legislation with respect to them."

So the general rules often stated, in substantially the same language, might well be extended by these explanatory rules which, in the cases referred to and many others, have become as well understood as those reduced to set forms of expression.

6. Rules 1 to 5 do not constitute a definite test of legitimacy of classification except as to general characteristics,

leaving the question as to whether any given situation falls within their boundaries or not, matter of fact.

7. Whether, upon the facts of any particular situation, it falls within the boundary of the rules for classification, is primarily for the legislature, subject to judicial disapproval for unreasonableness beyond any fair doubt.

8. The rule that classification must not be arbitrary refers to the group as such, not to differences in degree in which the individuals of the group are affected by the special circumstances calling for the classification.

There is this further principle to be observed in dealing with this subject which, for the purpose of having a reasonably complete code, so to speak, for testing any legislative enactment, challenged as invading the equality clauses of national or state constitutions, may well be stated.

9. In classification for the purpose of legislative treatment under the police power, it is a judicial function to determine whether the particular subject is within the police power, also whether the act has a real relation to the subject it ostensibly deals with, and whether the manner of treatment is unquestionably unreasonable. *State v. Redmon,* 134 Wis. 89, 114 N. W. 137; *Bonnett v. Vallier,* 136 Wis. 194, 116 N. W. 885; *Lawton v. Steele,* 152 U. S. 133, 14 Sup. Ct. 499.

Having placed before us pretty fully, it is thought, the principles by which the law in question must be squared as regards whether it transcends constitutional limitations, let us proceed to make the measurements. I choose to test the enactment in the first instance, at least, by principles, not by mere precedents, which latter method, as before indicated, in case of failure to fully analyze the examples, is liable to lead one astray. That liability, I am constrained to believe, is what, in the main, in this instance, has led my brethren to the conclusion embodied in the judgment from which I dissent.

The purpose of the law was to promote public safety both

as regards patrons of railway companies and the servants of such companies, and that satisfies the ninth rule as to one feature, to wit: that as to whether it is within the police power, unless the manner of treatment is clearly unreasonable.

The law applies equally to all subjects within the class, and the class is not fixed so as to prevent opening to let in or let out members, satisfying the third rule.

Now how about substantial distinctions between the particular class and others under the first rule, and such differences in situations and circumstances of subjects within such class, satisfying the first and fifth rules? In considering this we necessarily blend the domain of discussion with the eighth rule, that, while the boundaries of the class, as a whole, must be arbitrary, and the differences in situation between the subjects within the class and those without must be significant, the classification must not be arbitrary as regards extending it to classes of individual subjects not in any degree affected by the particular situation or circumstances forming the basis upon which the classification is grounded, though the degree of affection as to individual subjects may widely differ. These three rules, the first, the fifth, and the eighth, and also the second, form one general field which may well be treated as such, since the domain of each rule so blends with that of the others as to render segregation for more particular analysis liable to confuse.

The purpose as stated is public safety, the term "public safety" being used, as indicated, with reference to the particular body of employees and those they indirectly serve; the patrons of the employers. Is it germane to such purpose to extend the classification, not incidentally, but substantially, to put it not too strongly, manifestly, to a very large degree beyond the field of special hazard in view in the purpose to conserve public safety, giving special benefit to an army of employees not affected at all by such special hazard

or having to do at all with such hazard as regards patrons of the service and laying upon employers burdens accordingly? Face the rule that the difference in situation calling for the special treatment must pervade the class, not with equal degree as to each member thereof, but to some extent as to substantially all, keeping in mind and giving due weight to the impracticability of fencing the class about so accurately as to exclude every one not affected in any degree by the special hazard and include every one so affected. How can the whole be substantially pervaded by the special circumstances if a very large proportion of the employees are not affected at all? To affirm that it can, is to indulge, in my judgment, in a plain contradiction. So plain does it appear, as an original proposition, that I cannot perceive how one could venture to assert the contrary and ground a judicial decision upon it.

The mistake of my brethren at this point, as I view the matter, is in testing the law by the second rule with reference to the mere classification of the employees, instead of the business they are engaged in. If a mining company conducts a store, a farm, and other industries, subsidiary to the primary business, in which subsidiary employments the hazards of personal injury are no greater than like employment by private individuals or corporations, yet the number of the employees therein constitutes as large a proportion of the whole, perhaps, as the number in the specially hazardous branch, would a classification as regards extraordinary liability of the employer for personal injuries to employees, including all the subsidiary employments, be germane to a law having for its purpose public safety as regards extraordinary hazard of mining? The negative seems so plain as to be beyond possible question.

Does not the illustration exactly fit the case in hand and condemn the classification attempted? The special situation and circumstances of railroad employment having to specially do with public safety, is confined to the operating department

in the moving of cars and trains or work around them, or upon the track, or in some way so as to come, to some perceptible degree, within the zone of special risk, because of being more than ordinarily within the reach of those physical situations to which railroad perils, as ordinarily specialized, are incident.

The difficulty, under the act before us, is not that the large number of employees outside the special zone of hazard are not affected in the same degree by the special circumstances as those within, but is that they are not affected thereby at all, thus rendering the inclusion of them within the group receiving special protection for the public benefit, manifestly arbitrary, and the ostensible purpose to promote the public welfare a subterfuge for the actual purpose of extending a special privilege to a large number of persons without any legitimate common basis therefor.

At this point we may well note that the ostensible purpose of a law does not govern at all in testing it by constitutional limitations. The court may, yea it is its duty, to look behind the mere veil of any law which may appear legitimate, and if, in its substance, it is bad, to characterize it by its substance, not by its pretense. *Mugler v. Kansas,* 123 U. S. 623, 661, 8 Sup. Ct. 273; *Matter of Jacobs,* 98 N. Y. 98, 110; *State v. Redmon,* 134 Wis. 89, 114 N. W. 137.

If anything more was needed to demonstrate, on principle, that the classification is purely arbitrary and so not germane to the purpose to conserve public safety, it is furnished in the exclusion of shop and office employees. Shop employees who, by common knowledge, form a very large subclass, are in some degree within the zone of special hazard. The repair of locomotives, testing them for suitableness for the service, and the performance of other shop duties that might be mentioned, require service to quite a degree within the zone of special hazard.

Upon what ground was this large subclass of employees ex-

cluded from the peculiar benefits of the enactment, and other large classes, entirely removed from the zone of special hazard, included? I have searched in vain for any possible legitimate ground therefor and so been forced to the conclusion that the exclusion was purely arbitrary and probably unmindful of the constitutional restraints involved.

Of course, the foregoing condemnation could be easily avoided so as to save the law if it were subject to construction and could be held as intended to apply only to employees within the field of special hazard, but that has been rejected, necessarily, by the judgment of the court in holding that plaintiff, a mere fence builder, is in the class affected favorably by the law.

My brethren treat quite cursorily the feature of the law last discussed and say "shop and office employees" were excluded because not within "the unusual dangers and hazards of the business." How can we say that, when the special danger in a large degree by common knowledge does extend to such employees? Again, how can one say that and in the same breath justify the inclusion of many other subclasses of employees, including fence builders, manifestly not exposed to the special dangers at all? I confess I do not understand the logic.

Again, my brethren, it seems, endeavor to escape from the dilemma the shop employee feature of the law presents, notwithstanding the doubtful justification I have referred to, by asserting that if the subclass were improperly excluded that would not invalidate the classification; resting on that mere assertion and a reference without comment to *State v. Evans,* 130 Wis. 381, 110 N. W. 241.

I confess inability to discover anything in that case warranting the reference. The court there merely laid down the principle that, in case of the establishment of a boundary line of classification with general characteristics of those on the side excluded from the special rights granted or duties im-

posed, differing from those included, warranting the segregation, the fact of some excluded being as worthy, or as much in duty bound to bear the special burden, as those on the other side, does not militate against the legitimacy of such line. Here the case is far different.. The general character of the excluded subclass, not mere exceptional instances, calls for the special legislative treatment, quite as clearly as members of the included class, taken as a whole.    The decision of the case, as I read it, condemns rather than supports the court's conclusion.    It clearly is to the effect that the special class need not include all affected to any degree by the peculiar characteristics, but it must do so as far as practicable, and a plain unnecessary inclusion of a subclass not so affected and exclusion of a subclass so affected is fatal.    The language of the opinion is:

"It is suggested that this exemption is improper because these employees may be subjected to hazards or perils equally dangerous to those to which other employees are subjected. . . . That would not invalidate the classification."

It will be noted that the court's logic is not confined to an excluded class, having now and then a member on an equality with members of the included class, but to an excluded entire subclass of a general group, composed of men on the same plane, generally, as the common mass.    It seems that, on more mature consideration, my brethren would not wish to adhere to their logic.    Would it be legitimate to legislate specially for all cities of the third class, except one or more specially named, or all cities having a population of 10,000 people except one or several specially excepted?    Certainly not, on the most familiar principles of constitutional classification.    Otherwise room for that special legislation which is illegitimate would be so broad as to nullify completely the fundamental law as to equality.

I have thus shown, it seems, that the law in question plainly offends against governing principles.    Adjudications elsewhere which run counter thereto should not be adopted.

The principles, not the adjudications inconsistent therewith, should prevail. The correct rule, as I understand it, is to make use of precedents to illustrate principles, not to avoid them. When the principles and the precedents conflict it is the latter, not the former, which should give way. I say this conceding for the purpose thereof that the authorities upon which the court rely are out of harmony with the principles, but such want of harmony will disappear as we proceed, and disappear in favor of my dissent.

There is no precedent in our adjudications out of harmony with my conclusion. If it were otherwise, I would not hesitate to contend with the doctrine of *stare decisis* in order to uphold the principles. Which would have to give way would be governed very much by circumstances unnecessary to discuss.

The only case referred to on the subject discussed, decided by this court, is *Ditberner v. C., M. & St. P. R. Co.* 47 Wis. 138, 2 N. W. 69. It is sufficient to say that the question of constitutional classification was not there raised, discussed, or passed upon.

Reference to the decision on that subject is quite misleading, in my opinion. The legislation considered was upheld, solely as a legitimate amendment to corporate charters under the reserve power in the constitution. How that conclusion could have been reached, in view of the fact that there was no intent by the legislature to make any such change, as evidenced beyond controversy by the fact that it referred to foreign as well as domestic corporations, and the fact that no legislative authority exists to deal with the organic law of the former, is not perceived.

The court does not in the instant case attempt to support the legislation as an amendment of corporate charters. Therefore, we need not pursue the subject of the *Ditberner Case* at length. It is sufficient to show that the decision is quite beside the matter it is now cited to support.

It is by no means certain the court, as at present consti-

tuted, would follow the *Dilberner Case* on the precise point
there decided.   It is interesting to note that it has been fre-
quently cited in other jurisdictions with the same misappre-
hension as to the real point decided, as appears in the pres-
ent instance, looking at language only.   I think I am justi-
fied in saying, in passing, that the court does not at this time
intend to indorse the doctrine that legislation of the sort un-
der consideration can be regarded as an amendment of cor-
porate charters, and does not intend to condemn it, but to
leave the subject open for consideration at some future time
when the precise point may require consideration.

It is unfortunate, in my view, that the court now says that
on the former occasion it rejected the doctrine of *Deppe v.*
*C., R. I. & P. R. Co.* 36 Iowa, 52, respecting the proper basis
for classification of railway employees for legislation of the
sort in question, since such basis was the subject decided in
the latter but was one entirely foreign to the former.   The
doctrine of the Iowa case, as regards anything heretofore de-
cided by this court as to constitutional law, stands entirely
untouched.

My brethren refer to *Mo. Pac. R. Co. v. Mackey,* 127 U. S.
205, 8 Sup. Ct. 1161, in support of their decision.   A history
of the subject there treated will show that the case should be
really regarded as authority to the contrary of such decision.
It involved the law of Kansas making every domestic railroad
company liable to any person injured by negligence of its en-
gineers or other employees.   It was quite general in its terms
as regards the risks contemplated.   It had received construc-
tion by the supreme court of Kansas, where it was sustained
only by giving it the construction it had theretofore received
by the supreme court of Iowa, from which state it was bor-
rowed after such construction.   It was restrained, though
broad in its literal sense, to the particular persons exposed to
the special hazard of railroad operations, or to the particular
risks peculiarly incident to railroading.   *Mo. Pac. R. Co. v.*

*Haley,* 25 Kan. 35. It was held that the act permitted such construction and required it, as the parent law was so construed prior to its adoption in Kansas. The federal court sustained the law on the ground of the hazardous nature of the business, adopting the construction given thereto by the court from which the case was transferred.

Referring to the Iowa decision we find, unmistakably, that the initial legislation was only saved from condemnation as unconstitutional by restraining it, by quite extreme rules for judicial construction, to acts of persons within the narrow compass of engagement in the operating department charac‑ terized by the special hazard. It was said it could not be saved if it were held to extend to persons engaged in constructing the road. That "if it were so construed as to apply to all persons in the employ of railroad corporations without regard to the nature of their service it would be a clear case of class legislation. . . . Hence would be unconstitutional and clearly so."

My brethren also rely on *Minneapolis & St. L. R. Co. v. Herrick,* 127 U. S. 210, 8 Sup. Ct. 1176; *Chicago, K. & W. R. Co. v. Pontius,* 157 U. S. 209, 15 Sup. Ct. 585; *Peirce v. Van Dusen,* 78 Fed. 693, 47 U. S. App. 339; and *Tullis v. L. E. & W. R. Co.* 175 U. S. 348, 20 Sup. Ct. 136. The first followed the case already reviewed, so we read it contrary to the use thereof in the court's opinion. The same is true of the second. It went, unmistakably, upon the construction of the Kansas statute, given by the supreme court of that state, following that of the state from which the legislation was borrowed. Plaintiff prevailed because he was engaged in the peculiarly hazardous occupation of operating a railroad, to which occupation the law was supposed to be restricted. Whether he was within or without the zone of special hazard was the mooted question. The case, as I read it, does not deal with the subject under discussion at all in any other respect. It seems to have been inadvertently cited.

The fourth case is said to deal with the validity of an act abolishing the defense of negligence of a fellow-servant as to railway corporations and that it extended to the same class of railroad employees as does the law in question and that it was held proper to treat railway employees as a special class, re-affirming the case I have reviewed involving the Kansas law. I cannot understand the case that way at all. The Kansas cases were referred to as warranting special regulations as to specially hazardous occupations, but by way of argument. The law was of a most general nature, applying to all except municipal corporations, as regards particularly specified hazards of a peculiarly dangerous character and other specified risks, out of the ordinary. The court adopted the construction given by the Indiana court in *Pittsburgh, C., C. & St. L. R. Co. v. Montgomery,* 152 Ind. 1, 49 N. E. 582, to the effect that it dealt only with the special hazards peculiar to the business, not with employees regardless of whether they were within the zone of special hazard or not, excluding some within such zone and others not and including others wholly outside thereof, as in the law in question.

The Indiana court, except as hereafter stated, grounded its decision on adjudications of the supreme court of Kansas, Iowa, and Minnesota and the approval thereof by the federal supreme court under the rule that the construction of a state statute by the highest court of the state will be followed by the federal court as to cases arising in such state, each and all of which decisions are of the character of those heretofore referred to. *Att'y Gen. v. Railroad Cos.* 35 Wis. 425, and the *Ditberner Case* were referred to, neither of which dealt with the subject of constitutional classification at all, as we have heretofore seen.

Thus it appears plainly the learned Indiana court did not discover the real basis for the decision in either of the cases cited, though the fact remains that it sustained the law and the federal court followed its decision upon the theory that

it dealt only with a class including all within the zone of peculiar hazards and not including others. The point being made in the Indiana court that the law included many corporations whose business was not characterized by any hazard other than those incident to the same business conducted commonly by natural persons, the court declined to deal with the question, holding that the law was good in any event as to railroad companies. Whether that was sound ·or not may admit of some doubt.

At this point, following the order of the court's treatment, we reach a further reference in the opinion to the subject of shop and office employees, and their exclusion is justified upon the authority of numerous cases cited, including *Minneapolis &.St. L. R. Co. v. Herrick, supra; Chicago, K. & W. R. Co. v. Pontius, supra;* and *Pittsburgh, C., C. & St. L. R. Co. v. Montgomery, supra.* I need not pursue that branch of the case. Suffice it to say the opinion does not point out their application. How they justify exclusion of a subclass which is largely within the field of special hazard dealt with and inclusion of other subclasses which are not, my reading fails to discover. So far as they touch the subject they all go back by a path, unmistakably marked, to the Iowa decision sustaining such legislation within the zone of special hazard as the only legitimate basis of classification and the only way of saving it from invalidity. That is so, as we have seen, as to all cases we have referred to.

The same is true with the court's additional citation, *Georgia R. & B. Co. v. Miller,* 90 Ga. 571, 16 S. E. 939. There was no question of exclusion and inclusion disregarding hazards, as in this case.

A further additional citation, *Atchison, T. & S. F. R. Co. v. Matthews,* 174 U. S. 96, 19 Sup. Ct. 609, deals solely with the validity of a law allowing attorney's fees in addition to damages in case of recovery under a statute designed to penalize corporations for violating police regulations as regards

setting fires.    The federal court simply followed the decision of the state court, but in any event the case has too remote a bearing here, if any at all, for me to appreciate it.

I have now reviewed all of the supports relied upon for the conclusion from which I dissent, on the subject of constitutional classification.  . The entire group of citations are referable to *Deppe v. C., R. I. & P. R. Co.* 36 Iowa, 52,—which they expressly, directly or indirectly, follow,—conceded by my brethren to be contrary to their conclusion.    They failed, as it seems, to discover that the decision of the supreme court. of Kansas, adopted by the supreme court of the United States, merely upheld the Kansas law with the construction given thereto by the Iowa court.

My brethren disregard without difficulty *Lavallee v. St. P., M. & M. R. Co.* 40 Minn. 249, 41 N. W. 974; *Johnson v. St. P. & D. R. Co.* 43 Minn. 222, 45 N. W. 156; *Pearson v. C., M. & St. P. R. Co.* 47 Minn. 9, 49 N. W. 302; *Weisel v. E. R. Co.* 79 Minn. 245, 82 N. W. 576; and *O'Niel v. G. N. R. Co.* 80 Minn. 27, 82 N. W. 1086.    But the Minnesota law was quite as sweeping in its provisions as ours, omitting the feature of the latter as to shop and office employees.    It was construed the same as the Iowa law and the Kansas law and sustained upon the same ground as they were sustained.    It seems my brethren do not give proper dignity to those cases by merely suggesting that the basis for classification was held to be the extraordinary hazard to employees.    I think in that there is confusion between purpose of the law and the element of being germane to the purpose.    The purpose of all such laws is public safety.    The basis of classification has regard to the element of adaptation.    The decisions which are supposed to support the conclusion this court has reached, as well as the others, all make the special hazard the basis for the classification.    They all deal with a single class of legislation and are in harmony.

True, the Minnesota court said, "The manifest purpose

was to give the benefit to employees engaged in the hazardous business of operating railroads." Can there be any possible question but that the purpose of the act in question is to give special benefits to the same class and to others? The fact that the special benefits, in a sense, penalize the employers, and so operate to the benefit of the people generally as regards safety, does not militate against the fact that the primary benefit in the mind of the legislature was to employees. I see no escape from the conclusion that all these cases support the conclusion I have arrived at on principle alone and are in perfect harmony, leaving no room to reject some and adopt others.

The foregoing covers all ground traveled over by the court to its conclusion. I might safely, I have shown, rest my contrary conclusion on the precedents the court relies on if precedents alone were to govern. It was no fault of the learned counsel for appellant that the court did not take notice that the starting point of all the judicial authority referred to by respondent's counsel and the court is *Deppe v. C., R. I. & P. R. Co., supra.* These further cases cited by appellant's counsel from other states, also based on the logic of the Iowa case, were not referred to in the court's opinion. *Bradford C. Co. v. Heflin,* 88 Miss. 314, 42 South. 174; *Ballard v. Miss. C. O. Co.* 81 Miss. 507, 34 South. 533; *Beleal v. N. P. R. Co.* 15 N. Dak. 318, 108 N. W. 33. The gist of all is in the early Iowa case.

The upshot of the foregoing is that if the act in question could be sustained at all, it would have to rest on a preliminary construction of the statute in harmony with the numerous decisions referred to. I see no way to reach the preliminary construction because of the plain, unmistakable purpose in the act to include all employees regardless of whether operating strictly within the zone of railroad risks or not, with the exception noted, and that exception necessarily negatives any theory that any other employees are excluded under the

canon of construction *expressio unius est exclusio alterius.* As the injured person here was a mere fence builder and so not injured by any peril, properly denominable as a railroad risk, the complaint fails to state a cause of action under the universal rule for construction of such statutes as ours, where so framed as to be open to construction. 'Therefore, from any viewpoint the pleading can be reasonably measured it fails, utterly, in my judgment, to state a cause of action.

The decision upholding the third subdivision of the law upon the theory that it is a mere declaration of the unwritten law, I cannot subscribe to. True, we should not declare a law unconstitutional if a construction of it can be reasonably given which will avoid that result, but just as true a law not open to construction should never be varied in its plain, ordinary sense by an effort to construe it. It is only where uncertainty of sense begins that the office of judicial construction can properly become active. Further, just as true it is a canon of construction that it is to be presumed in the enactment of a law that the legislature intended some change in existing law, written or unwritten, or to make a new regulation of some sort. Any construction is to be avoided which would convict the lawmaking power of merely spreading a collection of words on the record in the form of a law, but in fact meaning nothing, if any rational view can be taken of the enactment leading to a different result. Again, in construing a law, after discovering ambiguity justifying it, the court should look, among other things, to its reason and spirit and read it according to the intent, if that can be discovered, expressed within the broadest reasonable scope of the words used; the fair, ordinary meaning of such language, however, to be taken, unless it appears clearly that some other was intended. All these principles are so familiar that citation of authority in support of them is unnecessary.

In face of the principles stated and the common knowledge that at the time of the enactment there was more or less sentiment against courts exercising the judicial power to take

cases from juries on the question of contributory negligence, upon such a question appearing by the evidence to be one of law only, the purpose of the legislature is quite plain. The state of public mind suggested, whether reasonable or not, we need not take time to discuss. Considerable unrest under the administration of the law in that regard existed going to the extent of suggesting that courts were prone to usurp the functions of the jury. It was not appreciated, it is thought, that the question of whether evidence shows contributory negligence beyond any reasonable view to the contrary, was never a jury question, and that no trial court could hold to the contrary without a breach of judicial duty. In that light and in the light of the plain letter of the enactment in question and the rules we have referred to, I could not, if I would, escape the conclusion that the legislature intended to, and supposed that it could, take from courts a power they had been accustomed to exercise in the ordinary performance of their duties under the plain mandate of the fundamental law.

Can there be any mistaking the meaning of the words, especially in the light of what has been said:

"The court shall submit to the jury the following questions: *First,* whether the company . . . was guilty of negligence directly contributing to the injury; *second,* if that question is answered in the affirmative, whether the person injured was guilty of any negligence which directly contributed to the injury; *third,* if that question is answered in the affirmative, whether the negligence of the party so injured was slighter or greater as a contributing cause to the injury than that of the company . . . ; and such other questions as may be necessary."

Discretion was left, it will be noted, as to "such other questions" but none as to the special questions covering the vital points of negligence. So looking at the legislative effort, all would agree that it is a usurpation, though an innocent one of course.

I would be exceedingly slow in reaching a conclusion that

the legislature intended to pass an unconstitutional law. In all my experience as a lawyer and judge, covering a period of nearly forty years, I have never known of an instance of such an effectuated intent and do not expect to meet with any in the future. It was a mistake, in my judgment, that is all. Nevertheless, it evinces that the entire enactment was allowed to take the form of law without being subjected to careful legislative scrutiny in the light of constitutional tests. To some extent, I should say, the rule applies to such a case, that in case of a court's conclusion of fact based on a wrong rule of law, the ordinary presumption of its correctness does not obtain. So when the legislature makes a law, so called, not taking note that its power is limited, its judgment on the basis entitling it to controlling significance within all reasonable bounds, is not incorporated into the work.

The view the court took of the act rendered it unnecessary, as was supposed, to consider subd. 8, providing that in case of an action in this state to enforce liability for an injury occurring in a sister state, the defendant shall not be permitted to plead or prove the decision of the latter state as a defense. The view I have taken rather calls for such consideration, but it may be done briefly. The provision was copied substantially *verbatim* from the law of Indiana. Doubtless it was borrowed, overlooking the fact that January 17, 1902, and prior to the adoption here, the supreme court of Indiana held that it was clearly an unconstitutional interference with property rights. The logic of the court's opinion on the subject is unanswerable. When a person is injured in a sister state through breach of duty by another as regards his personal safety, such person becomes vested, at once, with such rights of action to remedy the wrong as the law of such sister state affords and none other, and, in case of his death, the rights of personal representatives are likewise restricted. The action being transitory, the defense is likewise transitory. The two necessarily, upon familiar principles, go to-

.gether. A law of a state other than that of the injury, allowing prosecution of an action for the wrong upon a different basis than the right and preventing the use of a vested defense, is confiscation. That doctrine has support in our own decisions, in the decisions of the federal supreme court, and in the general trend of authority. *Second Ward Sav. Bank v. Schranck,* 97 Wis. 250, 73 N. W. 31; *Peninsular L. & C. Works v. Union O. & P. Co.* 100 Wis. 488, 76 N. W. 359; *Eau Claire Nat. Bank v. Macauley,* 101 Wis. 304, 72 N. W. 176; *Pritchard v. Norton,* 106 U. S. 124, 1 Sup. Ct. 102; *Hovey v. Elliott,* 167 U. S. 409, 17 Sup. Ct. 841.

The parts of the law thus invalid, as I think, leave nothing which the legislature would have enacted independently. Therefore, upon familiar principles the enactment is wholly void.

It is interesting to note that in any event the law may be very short-lived. The federal supreme court in the *Employers' Liability Cases,* 207 U. S. 463, 28 Sup. Ct. 141, held that a law which includes employees engaged in interstate commerce is as to that feature a regulation of such commerce. The federal law was condemned because it dealt with all employees of a railroad doing interstate business whether engaged at the time of the injury in such business or in intrastate business, and that the two features were inseparable. Hence the whole was held unconstitutional. Following the same line of reasoning, this court has very recently held that an act limiting the hours of labor of railway telegraphers of a railroad company doing both interstate and intrastate business, is necessarily a regulation of interstate commerce, as the two kinds of business done by the same employees are inseparable; hence that it is unconstitutional, Congress having already occupied the field as to interstate commerce and by a law materially different from the state law.

Since April 22, 1908, the same situation we dealt with regarding telegraphers has existed as to injuries to railway em-

ployees.  On that day Congress passed an. act, supposed to be free from the infirmity which led to condemnation of the one in the *Employers' Liability Cases* and thereby as to personal injuries to railway employees received in the course of their service in interstate transportation, occupied the field under the commerce clause of the constitution.  The law (see 35 U. S. Stats. at Large, 1907–8, p. 65) conflicts in a radical degree with our state provision.  The two may not be able to stand together under the logic of the decision in the *Telegraphers' Case (State v. C., M. & St. P. R. Co.* 136 Wis. 407).  Whether such legislation will not wholly displace our state act is in sight, but not for decision at this time.

We now close this rather lengthy, but I trust not too lengthy, opinion.  The vast importance of the question at issue seemed to justify the extensive treatment I have devoted thereto.  With the amount of labor we have, work of this independent sort would not be entered upon other than under the stimulus of a supposed command of duty.  The learned counsel for appellant and counsel for respondent as well, presented the case with distinguished ability and helpfulness.  In my view, as indicated, the position of appellant is grounded on principle and on a long line of well-reasoned judicial authority with which there is, substantially, no conflict.  So believing, it seemed a duty to the court, to the profession, and to the administration of the law generally, to express fully my views.  I will say here, as on another occasion for the court, we do not doubt but that the very best of intentions were the mainspring of the enactment in question, but good intentions can never save a legislative effort if the paramount law condemns it.  The constitution was made to guard the people against the dangers of good intentions as well as bad intentions and mistakes.  The former may excuse a void enactment, but never justify it.

It is never a pleasant duty to perform, to condemn a law as void.  The dignity of the legislative office is high.  Co-

ordinate branches of the government owe great deference thereto while maintaining the dignity of their own field of activity.   It is upon co-operation of the three grand divisions of our governmental system upon that high plane, each doing its duty firmly and submitting cheerfully to the authority of the other within the constitutional scope thereof,—that we must rely for that strong, efficient government which the fathers endeavored to establish by a constitution, which deserves our most distinguished consideration as an ideal declaration of principles essential to the purpose declared in its opening lines.

Perhaps it is unnecessary to close with the statement that it is my opinion the demurrer should have been sustained.

The following opinion was filed April 24, 1909:

WINSLOW, C. J. (concurring). While I heartily agree with the opinion of the court in this case, I deem it proper, in view of the importance of the case, to add a few words of my own in order to express in my own way the grounds upon which I understand the decision to be based.

The main contention of appellant is that the law is unconstitutional because not confined to those employees who are actually engaged in operating trains or incurring risks peculiar to the railroad business.   The claim is that there can be no classification except a classification of employees based upon the character of the risk incurred.   There is doubtless much authority which justifies this claim.   Such was unquestionably the controlling idea when laws of this nature first made their appearance on the statute books.   Many such laws were confined by their terms to injuries resulting from hazards peculiar to the railroad business, and some were upheld only because the courts were able to construe them as intended only to cover injuries resulting from such hazards. Whether the last-named courts would now feel required to so

construe such laws in order to sustain their constitutionality may be doubtful. I think not, and for this reason:

Railway corporations engaged in the business of common carriers have been classified and subjected to peculiar and special legislation from the earliest times, and properly so. Their situation and the peculiar character of their business and its relation to the public safety demand special legislation. This law, therefore, in classifying railway carriers and subjecting them to different liabilities, only follows many other laws whose constitutionality never has been questioned. Viewed in the light of a classification of railway carriers rather than as a classification of employees or dangers, there seems to me no reason why it should not be sustained without difficulty. Railway carriers conduct a business unique in its dangers, both to their employees and to the public, and are charged with unique liabilities to the entire public. These are considerations which suggest or demand special and peculiar legislation; and this legislation may well be along the lines of an increased liability for the negligence of their own employees, not only in the operation of trains but in all the railway business.

From the fence repairer to the locomotive engineer, practically every railway employee is doing something upon which depends not only the successful operation of the railroad but the safety of the passengers who ride over it. The fence repairer in the present case was engaged in assisting in making travel over the road safe from the danger of collision with animals. He was performing a duty to the public with which the railroad is charged. The man repairing fences on a farm is performing no such duty. Herein lies the distinction between the two acts, and herein lies, also, the reason which calls for special legislation requiring higher care on the part of the railway company in the selection of all of its employees, and imposing greater liability for the acts of employees than is required of an ordinary employer.

Kiley v. Chicago, M. & St. P. R. Co. 138 Wis. 215.

In a word, it is proper to subject railway carriers to a higher degree of liability for the neglect of their servants, not simply because the business has peculiar dangers, but because it bears a peculiar relation to the safety of the public which no other business bears, and hence greater diligence in the selection of its employees may justly be demanded and enforced by means of a law imposing a heavier liability than that imposed on ordinary employers. This principle was, I think, fully recognized in the *Employers' Liability Cases,* 207 U. S. 463, 28 Sup. Ct. 141, where the federal law which attempted to make an interstate railway carrier liable to any of its employees for injuries resulting from the negligence of co-employees, notwithstanding slight contributory negligence, was under consideration. It is true that the law was held void, but only on the ground that it covered intrastate commerce as well as interstate commerce, and hence was beyond the power of Congress to enact. Otherwise the law, which covered by its terms all employees, was practically approved. Mr. Justice WHITE, who wrote the opinion of the court, says that if the law applied to the District of Columbia and the territories only it could not be questioned, because the legislative power of Congress over these regions is plenary and not dependent on the interstate commerce clause of the constitution. Mr. Justice MOODY, in his dissenting opinion, says:

"It is rather startling to hear that in enacting laws applicable to common carriers alone Congress has made a capricious and arbitrary classification. From time immemorial the common law has set apart those engaged in that business as a peculiar class, to be governed in many respects by laws peculiar to themselves."

Thus it is seen that the supreme court of the United States, in treating of a law substantially identical with the law before us, regarded it as a law classifying railway carriers and not as a law classifying laborers. In this view I can see no difficulty with the main provision of the law, which makes

railway carriers liable to an employee who may be injured by the negligence of a co-employee. It is a classification of railway carriers which is reasonably suggested, if not demanded, not merely by the peculiar risks incurred by the employee, but by the highly important duties which the railway companies and their employees are in duty bound to perform for the safety of the public.

As to the exclusion of shop and office employees a different question arises. It is undoubtedly true there may be classification among employees, if the circumstances of the employment are so far different as to suggest the propriety of classification. As a general rule, shop and office employees are in less danger from the negligence of their co-employees, and perform duties less directly connected with the safety of the traveling public, than train employees and construction or repair gangs. The legislature deemed the difference in duties sufficient to exclude shop and office employees from the provisions of the law, and the court would not be justified in holding that the legislature was wrong in its judgment.

Upon a motion for a rehearing there was a brief for the appellant by *H. O. Fairchild,* attorney, and *Burton Hanson* and *C. H. Van Alstine,* of counsel, and a brief for the respondent by *Minahan & Minahan.*

The motion was denied March 9, 1909.