ZERATSKY, Appellant, vs. CHICAGO, MILWAUKEE & ST. PAUL
RAILWAY COMPANY, Respondent.

*October 28, 1909—February 1, 1910.*

*Railroads: Injuries to employees: Statute construed: Proximate*
*cause: Contributory negligence: Comparative negligence: Ques-*
*tions for jury: Degrees of negligence: Appeal: Review of evi-*
*dence: Rules of railway company: Construction: Burden of*
*proof.*

1. In subd. 3, sec. 1816, Stats. (Laws of 1907, ch. 254), in the phrase
"negligence *directly* contributing to the injury," the word "di-
rectly" is used in the sense of *proximately,* and its use does
not operate to change the law on the subject of proximate cause.

2 Under sec. 1816, Stats. (Laws of 1907, ch. 254), in an action
against a railway company for injuries sustained by an em-
ployee, it is for the court to determine whether the evidence
tends to show negligence attributable to the company and
whether it tends to show contributory negligence of the in-
jured person. If the evidence does so tend, it is for the jury to
determine therefrom whether or not there was in fact such neg-
ligence or contributory negligence. If it is found that the neg-
ligence of both parties concurred to produce the injury, the
jury is then to determine whether the negligence of the in-
jured person was slighter or greater as a contributing cause to
the injury than that attributable to the company, unless the
evidence permits of but one inference, in which case the ques-
tion is to be decided by the court as a matter of law.

3. It is not impracticable to have the jury determine whether the
negligence of the injured person was slighter or greater as a
contributing cause to the injury than the negligence of the
company; and the determination of that question need not be
based upon the classification of the degrees of negligence into
slight, ordinary, and gross.

4. In reviewing a decision of the trial court to the effect that, as
matter of law, plaintiff's negligence was at least equal to that of
defendant as a contributing cause to the injury, the permissible
inferences from the evidence which are most favorable to plaint-
iff must be assumed to be the inferences which the jury would
have drawn.

5. Under a rule of a railway company that when a train stops be-
tween stations a flagman must immediately go back with proper
signals to stop any train that may be following, and another
rule that train and engine men will be held equally responsible

for a violation of any of the rules governing the safety of trains and must take every precaution for the protection of trains even if not provided for by the rules, it was the duty of the rear brakeman of a freight train which stopped between stations to go back with the required signals, though not directed to do so by the conductor or by signal from the engineer as provided in another rule.

6. Under the evidence in this case it was a question for the jury whether the negligence of the rear brakeman on a freight train which had stopped between stations, in failing to go back with signals to stop any train which might be following, was slighter or greater, as a contributing cause to his injury in a collision between a train so following and his train, than the negligence of other employees, attributable to the company.

7. In passing upon such question all the acts of other employees occupying positions of responsibility with respect to the movement of the trains (including in this case the train dispatcher, the engineer of the following train, and the conductor and engineer of the freight train) must be viewed in comparison with the acts of plaintiff, in the light of their respective duties and responsibility.

8. Sec. 1816, Stats. (Laws of 1907, ch. 254), does not change the rule that in an action by a servant for personal injuries the burden of showing contributory negligence is upon the defendant.

MARSHALL, J., dissents.

APPEAL from a judgment of the circuit court for Brown county: S. D. HASTINGS, Circuit Judge. *Reversed.*

Plaintiff was the rear brakeman on the defendant's extra freight train, consisting of fifty-four cars, a caboose, and an engine, which left Green Bay, Wisconsin, September 28, 1907, at 10:10 p. m., bound for Milwaukee. It had a full crew of trainmen, consisting of the engineer, fireman, conductor, and two brakemen. The train proceeded south through De Pere at 11:05 p.' m., and through Askeaton, and when about one and one-fourth miles from Hilbert Junction the engine ran out of water and was unable to pull the train to Hilbert Junction. The plaintiff was in the caboose when the train stopped. The engineer, fireman, conductor, and other brakeman, without informing plaintiff of their intention, cut the engine from the train and proceeded with it to Hilbert Junction to get a

supply of water without giving a signal to the plaintiff, as required by the following rule of the company:

"Rule 26. The one long, two short, and one long blast of the whistle thus, ———, — —, ———, will be given by engineers when they find it necessary to stop between stations and to notify conductor, thus enabling him to drop off and send back a flagman."

As soon as plaintiff observed that the train had stopped he left the caboose and went forward to about the middle of the train to ascertain the cause of the stopping. He there observed that the engine had been cut off and had left with the rest of the crew, and he then started back. The plaintiff stated that while going forward and coming back he observed the odor of a hot box, and he tapped the boxes to find the one, and immediately upon his return he went into the caboose to get his dope bucket to fix it. He testified that he took no more time than was necessary to make this trip. "Special rules for train and engine men" of the defendant contains the following:

"Rule B4. Conductors and brakemen must examine their trains, whenever there is an opportunity to do so, looking particularly for hot boxes and defective draft and brake rigging."

Meanwhile the defendant's regular passenger train bound for Milwaukee on the same line as that on which the freight was proceeding had arrived at Green Bay at about 12:30 a. m. and had left a few minutes later. At De Pere it was permitted to enter the block which was occupied by the freight train. One of the rules of the defendant was as follows: "Rule 3. Trains must not pass a block signal at danger except under authority of a clearance card form 168." The conductor and engineer were given permissive and clearance cards under the following rules, which trainmen are supposed to know and obey:

"Rule 4. When the block signal stands at danger, the operator issues a clearance card which states that he has no orders or no further orders for the train named. The train receiving

clearance card may proceed if its time-table rates or special orders permit it to do so.

"Rule 5. The permissive card is used when trains are permitted to pass a block signal at danger and enter the section under notice that the preceding train has not cleared the same section. This is to be used only by direction of the train dispatcher.

. "Rule 6. When a train is to proceed under a permissive card, the conductor and engineer must each have a card of the following form properly filled out and signed by the train dispatcher."

"Rule 10. Trains running under the authority of a permissive card or caution signal must run with great care and at reduced speed to insure against collisions with trains ahead."

A special caution order was issued to the conductor and engineer in these words:

"Extra east, Dietzler conductor, left De Pere at 11:42 p. m. and has not yet arrived at Hilbert Junction. Proceed cautiously, expecting to find them on main line at any point without flag protection."

The passenger proceeded south—or east as it is called in railroad parlance—and, when running at a speed of about thirty miles per hour, collided with the rear end of the freight train which had stopped on the main track a mile and one-quarter from Hilbert Junction. The freight train crew had not been specifically informed that the passenger train had been permitted to enter the same block or section of track as was occupied by the freight train. The plaintiff, who was in the caboose of the freight train, was seriously injured by the collision. The fireman of the passenger train was killed and the engineer was injured. There was a straight and unobstructed stretch of track back of the caboose of 3,000 feet. Whether or not the red lights were burning on the caboose was a disputed question on the trial.

The following rules of the defendant regarding the operation of trains were in force at the time of the collision:

"Rule 62. When a train stops between stations, a flagman must immediately go back with proper signals to stop any

Zeratsky v. Chicago, M. & St. P. R. Co. 141 Wis. 423.

trains that may be following. Not a moment must be lost in inquiry as to the cause of stoppage or its probable duration. The flagman must go back instantly and shall take not less than three torpedoes, also a red flag by day and a red and white light by night, and shall place one torpedo on the rail on the engineer's side when three-fourths of a mile (twenty-three telegraph poles) distant from the rear of train, and at a further distance of one-fourth of a mile (eight telegraph poles), he shall place two torpedoes on the rail on the engineer's side. He will then, selecting a place where the view is long and clear, remain until the train is stopped or he is recalled. Returning he will leave two torpedoes at the most distant point from his train and take up the rest. Whenever it becomes necessary, the forward end of the train shall be protected in the same manner."

"Rule 50. Train and engine men will be held equally responsible for violation of any of the rules governing the safety of trains, and they must take every precaution for the protection of trains, even if not provided for by the rules."

"Rule 26. Conductors will be held responsible for the faithful performance of the duty required on the part of their brakemen."

"Rule A58. Trains moving under permissive card will be held responsible for an accident in the nature of colliding with the train occupying the section which required movement under the permissive card. Engineers will not be censured for moving at a speed to insure against accident."

The defendant alleges that the collision was caused by the failure of the passenger engineer to observe its train orders and the rules and regulations known to him, together with the contributory negligence of the plaintiff and his violation of the defendant's rules and regulations.

At the close of the testimony the court, on defendant's motion, directed a verdict for the defendant, and judgment was entered upon the verdict so directed. This is an appeal from the judgment.

For the appellant there was a brief by *Wigman, Martin & Martin,* and oral argument by *P. H. Martin.*

For the respondent there was a brief by *Greene, Fairchild, North & Parker,* and oral argument by *H. O. Fairchild.*

The following opinion was filed December 7, 1909:

SIEBECKER, J.   The right of the plaintiff to recover in this action is governed by the provisions of sec. 1816, Stats. (ch. 254, Laws of 1907), which provides that:

"Every railroad company shall be liable for damages for all injuries . . . sustained by any of its employees, . . . when such injury . . . shall have been sustained by any . . . employee of such company, while engaged in the line of his duty as such and which such injury shall have been caused in whole or in greater part by the . . . negligence of any other officer, agent, servant or employee of such company, . . . in the discharge of, or . . . by reason of failure to discharge his duties as such."

It is also provided that the court shall submit to the jury the questions whether any negligence attributable to the company "directly contributed to the injury," and, if such negligence is found, "whether the person injured was guilty of any negligence which directly contributed to the injury," and, if the jury shall find the injured person guilty of contributory negligence, the court shall then submit to them the inquiry "whether the negligence of the party so injured was slighter or greater as a contributing cause to the injury than that of the company."   It is further provided:

"In all cases where the jury shall find that the negligence of the company . . . was greater than the negligence of the employee so injured, and contributing in a greater degree to such injury, then the plaintiff shall be entitled to recover. . . ."

The trial court directed a verdict for the defendant upon the ground that the evidence in this case showed as matter of law that the company's negligence, which concurred with that of the plaintiff to produce his injuries, was not greater and contributed in no greater degree to such injuries than the plaintiff's contributory negligence.

In *Kiley v. C., M. & St. P. R. Co.* 138 Wis. 215, 119 N. W.

309, 120 N. W. 756, we had occasion to declare that these provisions of the law did not affect the judicial power of the court to determine whether the evidence presented tended to show negligence attributable to the company and contributory negligence of the person injured, and, if the evidence tended to show such negligence, it was for the jury to determine therefrom whether or not in fact such negligence or contributory negligence existed. It was also decided that the provisions declaring that the contributory negligence of the person should be no bar to his recovery in cases wherein the jury should find that the negligence attributable to the company "was greater than the negligence of the employee so injured, and contributing in a greater degree to such injury," were within the legislative power of police regulation.

Upon this and other appeals, in actions under this statute, additional considerations have arisen respecting the interpretation of the context of the act and its effect in the modification of the law as it theretofore existed. Subd. 3 of the act requires that there shall be submitted to the jury the question whether the company's negligence and the injured person's contributory negligence *directly* contributed to the injury. The inquiry is suggested: Does the use of the word "directly" operate to modify the law of proximate cause in the law of negligence? We discover nothing in the phraseology of the act indicative of a legislative intent to modify the law on this subject. Nor does the language employed necessarily operate to effect a change as to what shall constitute proximate cause. The provisions are that the jury shall determine whether the company and the injured person are guilty of negligence "directly contributing to the injury." The word "directly" was evidently employed here in the sense of proximately, and was intended to include and comprehend the negligence which naturally and probably caused the injury; that is, the negligence which proximately contributed to produce the injury. True, it has been said, in cases reviewing

instructions to juries in negligence cases where the jury were informed that the proximate cause of an injury was such negligence as directly caused it, that such instructions were incorrect and failed to properly inform the jury that the right to recover rested on the fact that the damages claimed were the natural and probable result of the negligence charged.    The criticism in these cases of the use of the word, as there applied, was that it did not convey to the jury the idea that the alleged injury must be shown to have naturally resulted from the negligence charged and that it was within reasonable anticipation that such negligence might cause an injury.    As used in this statute it is applied to negligence in the accepted legal sense of responsible and efficient causation.    This seems to us the reasonable and natural inference from the phraseology of the statute.    We think it was so intended by the legislature, and that the words of the statute, "negligence directly contributing to the injury," were employed as expressive of the idea of negligence proximately contributing to the injury, and in the trial of cases wherein it is appropriate to inform juries of the provisions of the law it is to be interpreted that the clauses referring to "negligence directly contributing to the injury" are applied to the negligence proximately contributing to the injury.

The statute also provides that if the jury shall find that the negligence attributable to the company "was greater than the negligence of the employee so injured, and contributing in a greater degree to such injury," then plaintiff's contributory negligence shall be no bar to his recovery.    This abrogates the pre-existing law that the contributory negligence of the injured person may defeat recovery.    This provision is a complement to the preceding subd. 2, which makes railroad companies liable for injuries to employees which have resulted "in whole or in greater part" from the negligence attributable to them.    It is to be noted that the questions prescribed by subd. 3 are made to harmonize with subd. 2, in that the negligence

-of the company and the contributory negligence of the person
injured are treated, in effect, as contributing causes to the in-
jury.    While the same phraseology is not employed in subd. 4
in dealing with this subject, it is evident that the legislature
intended this provision to carry into effect the liability created
by subd. 2 and to so modify the contributory rule as to accord
therewith and to enforce recovery in those cases wherein the
negligence of the injured person should be found to be slighter
as a contributing cause to the injury than that of the company.

Interpreting these provisions together, we are persuaded
that the legislative intent was to apply this legislation to the
law as established by the decisions of this court.    It had been
recognized by this court that the negligent acts of two or more
responsible agencies might proximately contribute to produce
an injury and that their negligences might concur in different
degrees in proximately causing it.    In *Cunningham v. Lyness,*
22 Wis. 245, the court, referring to the concurrence of an in-
jured person's negligence with that of another as a bar to re-
covery, states: "A party cannot recover for an injury of which
his own negligence was in whole or in part the proximate
cause."   In an exhaustive review of the decisions of this court
on the subject of negligence and contributory negligence in
*Bolin v. C., St. P., M. & O. R. Co.* 108 Wis. 333, 84 N. W.
446, the subject was adverted to.    The result is embodied in
the headnote and is stated thus:

"In an action to recover damages claimed to have been
caused by actionable negligence of the defendant, contributory
negligence of the plaintiff, however slight, precludes his recov-
ering damages, notwithstanding negligence of the defendant,
however great, contributed thereto."   .

This idea that the concurrence of the negligences of both
parties to a legal controversy might constitute the proximate
cause is also recognized and exemplified in numerous crossing
cases that have come before this court.

The context of the statute indicates that the legislature as-

sumed this to be within the legal conception of proximate· cause in the law of negligence, and proceeding thereon framed this statute to modify the right of recovery in negligence cases· against railroad companies by providing that if the company's· negligence contributed to cause the injury in greater degree· than that of the injured person, then the company should be· liable for the resultant damages as if its negligence had been the sole cause of the injury; or, in the language of subd. 4, if "the negligence of the company . . . was greater than the negligence of the employee so injured, and contributing in a greater degree to such injury, then the plaintiff shall be entitled to recover." In administering the statute in cases as they actually arise, it devolves on the court to determine whether there is any evidence tending to show negligence attributable to the company and contributory negligence of the· injured person which proximately contributed to the injury complained of. If the evidence produced shows that the negligences of both parties to the action concurred to produce the injury, unless the evidence is so clear and undisputed as to· permit of only one inference on the question, it then becomes a question for the jury to determine whether the negligence of the injured party was slighter or greater as a contributing· cause to the injury than that attributable to the company. In case the evidence permits of only the one inference it devolves on the court to decide the issue as a matter of law. Whether a case is one for a court or jury to determine cannot be settled by any general rule or classification of cases, but must be determined in the light of the facts and circumstances of each particular case. The question is not ascertainable by any rule of absolute measurement, and it therefore must be submitted to human judgment.

It has been claimed and the suggestion is made in argument on this feature of the law that it is practically impossible for a jury to determine such controversies upon a scale of infinite degrees, and that the legislature therefore must have intended·

that the law should be applied in view of the generally accepted classification of the degrees of negligence into slight, ordinary, and gross, and that such degrees of negligence should be observed in comparing as contributing causes the negligence of the company and that of the injured person. We discover no such intent or provision in the law, nor do we deem it impracticable to have the jury judge whether the negligence of the injured person contributing to cause the injury is slighter or greater than that attributable to the company. Applying the statute to the case before us, we cannot accede to the defendant's claim that it would be mere speculation and guesswork for the jury to attempt to determine whether plaintiff's contributory negligence was slighter or greater as a contributing cause than that of the defendant.

It is alleged that the plaintiff was guilty of negligence in omitting to perform his duty as brakeman on the occasion in question, in that he failed to protect the rear of the freight train from the passenger train, and that this failure of duty by him was a proximate cause of the collision and his injuries. The contention is that but for plaintiff's contributory negligence the injury would not have been received, and hence that the negligence of the plaintiff in its most favorable aspect under the law is equal to the negligence attributable to the defendant as a contributing cause to the injury. In the solution of this question all of the inferences from the evidential facts most favorable in support of the plaintiff's alleged cause of action must be assumed to be the view of the case which may be taken by the jury. The contention that plaintiff's duty did not require him to flag the train under rule 62 unless directed so to do by the train conductor or by a signal from the engineer by a blast from the whistle cannot be sustained. The rule is clear in its provision that when a train stops between stations a flagman must go back to stop any train that may be following, give the prescribed signals to it, and remain at the place to which he has gone until the train stops or he is re-

called.    This duty is further enjoined by rule 50, which informs persons engaged in the train service that:

"Train and engine men will be held equally responsible for a violation of any of the rules governing the safety of trains, and they must take every precaution for the protection of trains even if not provided for by the rules."

We find no support for plaintiff's claim that the duty imposed by these regulations was disregarded in practice to such an extent as to abrogate them.    Nor is it shown that the plaintiff was informed while in defendant's service that these rules and the duties imposed thereby were not obligatory on him.    We think that the plaintiff as rear brakeman of this train was required to perform whatever duty these rules imposed on him.

The evidence tends to show that the plaintiff was the rear brakeman on a freight train which came to a stop on the main track between stations.    He had not been informed by the engineer's signal that the train was to make a stop.    So far as he then knew, the train might be stopped only momentarily. In the operation of trains stops of a momentary character must inevitably occur, and on such occasions it would be both unnecessary and impracticable for the rear brakeman to leave the train at once to signal a train that might be following.    It is obvious that if the brakeman should immediately so leave his train on all such occasions, he would on many occasions be wholly separated from his train.    He testifies that he went forward to a point where he observed that the engine had been detached from the train and had departed for Hilbert Junction; that then he crossed over to the other side of the train; that he observed the odor of a hot box, and that he attempted to locate it while he was returning to the caboose; that he took no more time than it naturally takes to make such a trip; that he returned to the caboose without intending to go and signal the coming passenger train; that he at once looked for the dope bucket in the caboose to fix the hot box; and that the col-

lision occurred immediately. It is argued that this amounts
to a violation of his duty under the rules and establishes his
contributory negligence. Upon learning that the engine had
departed for Hilbert Junction it became the duty of the
plaintiff to procure the means and to go back to signal a com-
ing train, and in omitting so to do he was guilty of not exer-
cising that care which the situation and the exigencies of the
case demanded, but it is not so clear that it can be held as
matter of law in what degree it contributed to produce the
injury. The contention that it amounted to the very highest
degree of negligence because the accident would not have
happened but for the violation of defendant's rules seems
necessarily to assume that the plaintiff, in making this trip
to ascertain whether the train was to stop more than mo-
mentarily, and in not instantly, upon the stopping of the
freight train, taking steps to signal the coming passenger
train, was guilty of such a high degree of negligence as to pre-
clude his recovery. He testifies that he consumed from fif-
teen to twenty-five minutes on his trip; that he relied on the
red-light signals displayed on the rear of the caboose to signal
the coming passenger train; that he went to the caboose for
the dope bucket to fix the hot box, and while in this act the
collision occurred. It is not clear from the record that if on
his return to the caboose he had immediately proceeded to
procure his lantern and torpedoes to signal the coming train
he would have prevented the collision. The degree of negli-
gence involved in these acts is not so clear that it can be de-
termined as a matter of law. Under the circumstances it is
a mixed question of law and fact which must be resolved by
the jury.

The case also demands of the jury that they determine in
what degree the negligence attributable to the company con-
tributed to produce the injury. Among the matters bearing
on this question it is alleged that the train dispatcher was
derelict in his duty in permitting the passenger train to enter

the block as he did; that the engineer of the passenger train omitted to obey special and express orders in running his train on the block; and that the conductor and the engineer of the freight train were negligent in not signaling or warning this brakeman of the stop, and in failing to ascertain before stopping that the plaintiff as rear brakeman was on duty or capable of protecting the rear of the train. In passing on the question of whether or not the company's negligence caused plaintiff's injuries in greater degree than that of the plaintiff, all of these facts relating to the omission of duty on the part of these servants who occupied positions of great responsibility in the conduct of the defendant's business must be viewed in comparison with the acts of the plaintiff in the light of their respective duties and their responsibility to exercise a degree of care commensurate to the exigencies of the situation. The case is not so plain and clear that but one inference can reasonably be drawn from the evidence as to these questions, and they therefore should have been submitted to the jury for determination.

The plaintiff's contention that the defendant is estopped from charging plaintiff with contributory negligence because he was sent out on this trip in such a state of physical and mental exhaustion from being in constant service for the defendant immediately preceding it as to make him incapable of comprehending and performing the duties required of him is not sustained. The evidence is undisputed to the effect, and plaintiff claims, that he attended to and comprehended all his duties. His whole claim and the showing refute the inference that he was unable to attend to his duties.

It is averred by the defendant that since the plaintiff has the burden of proving that the negligence attributable to the defendant was a greater contributing cause to the injury than that of the plaintiff, this involves a modification of the rule which has heretofore obtained in this state which casts the burden of proving plaintiff's contributory negligence on the

defendant. This rule operated to relieve the plaintiff from the necessity of showing himself free from contributory negligence. We discover nothing in the law evincing an intention of the legislature to change the rule, nor do we find that such a change is necessary for the orderly administration of the various provisions of the law.

From the views indicated, it results that the court erred in directing a verdict. The case should have been submitted to the jury for determination of the issues under the law as amended by ch. 254, Laws of 1907.

: *By the Court.*—Judgment reversed, and the cause remanded for a new trial.

The following opinion was filed December 21, 1909:

MARSHALL, J. (*dissenting*). Truly, as an eminent writer said many years ago, "To dare; that is the price of progress." "It is necessary, for the sake of the upward march of the human race, that there should be proud lessons of courage permanently on the heights." Looking at the revolutionary character of ch. 254, Laws of 1907 (sec. 1816, Stats.), from that standpoint alone; considering it as a striking public conception of the needs of new conditions and expression thereof, independently of fundamental principles, it responds in full measure to the sentiment of the literary philosopher. To that extent it is admirable; but viewing it, as we must, from the standpoint of our constitutional system, and legal principles settled by the courts, not within the province of legislative authority to disturb, one can but be impressed with the idea that the limits upon legislative power were not carefully studied, neither was the meaning of significant terms in the law, as defined and settled in the common law and judicially recognized for ages, clearly comprehended.

It may be that the times called for such a radical change of human responsibility as was attempted to be wrought by the

act. It may be that they called for still greater changes. I would not take issue thereon. That impatience with existing law and its administration was the mainspring of the legislation, and that such impatience dimmed the perceptives somewhat as to fundamental principles, I cannot doubt.

I must look upon the legislature as a body of wise, intelligent men, who, either as a whole, or by the particular ones who were permitted to cast the legislation, knew what they desired to do and used language to that end. "If the end be legitimate" and the manner of reaching it be "appropriate to that end," in any reasonable view, of course I would sustain the law without reluctance, regardless of my personal idea of the policy thereof. I would not interpolate words, not in place by necessary implication, nor substitute one word for another in order to read out of the law a meaning which is not there in its literal sense, and which, looking at the conditions which moved the enactment of it, it seems that neither the legislature, as a whole, nor those particular members, or assistants who were permitted to frame the law, intended. I would take the law as I find it, and sustain it if it be legitimate, and judicially nullify it if it be not.

I am not unmindful that courts go a great way, and properly so, to save a law from absurd consequences, and particularly from condemning it as unconstitutional, striving to read therefrom a meaning which is legitimate and can fairly be said to be within the reasonable scope of its language, resolving all reasonable doubts to that end; but to nullify the will of the legislature by attributing to its language a meaning not intended, though the effect thereof might be to save the law from condemnation as void for uncertainty or unconstitutionality, is as wide a departure from the judicial function as to condemn it when not clearly outside constitutional limitations. It were better for the public interests, and would give greater dignity to the lawmaking power, to take the legislative ideas as found expressed, if they can be discovered

reasonably, and give effect to them or not according as they are within or without proper boundaries of legislative effort.

In scanning an act of the sort of the one before us we can no more shut our eyes to the present method of producing laws, than we can to the conditions which lead to them, in determining their character and constitutionality. The former sheds much light on the legislative purpose, and the latter as much effect upon the weight to be given to the fact of legislative approval. Not on the mere policy of the legislation, for that is not a field for judicial exploration, but on the question of whether the enactment is within or without the fundamental limitations of legislative authority.

While the principle is as vital now and of as much dignity as ever, that the judiciary must pay such high regard to the lawmaking power as not to place the stamp of judicial condemnation upon its work, unless it transcends, beyond reasonable doubt, constitutional limitations, in determining whether it does or does not, some, if not all, who are called upon to weigh the matter, will give a measure of consideration to the great change which has come about in recent years in the manner of making laws. That enactments, under present conditions, have some less weight of *prima facie* support from the mere incident of legislative approval, with some judicial students and administrators, than formerly, is most natural.

The act in question has been one of the most troublesome pieces of legislation with which the court has ever had to deal. I think all agree that it was framed by a layman or laymen, or by some person, or persons, without proper conception of legal terms and the scope of legislative authority, or the thought was to cut loose from judicial learning and to use words as they are ordinarily understood by people generally in common every-day life. That is strikingly apparent, as is indicated in *Kiley v. C., M. & St. P. R. Co.* 138 Wis. 215, 119 N. W. 309, 316, in the obvious, as I think, attempt to take from the court its constitutional authority to deter-

mine when, on the evidence, there is a controverted question
of fact for submission to the jury, and to take from it the ju-
dicial function of determining what elements, particularly
those of proximate cause, in the legal sense, make up a case
of responsible fault.

The court is commanded by the legislation to submit spe-
cific questions to the jury, evidently, I think, as the ones in-
volving responsible fault.    It is declared that, "In all cases
under this act the question of negligence and contributory
negligence shall be for the jury" (sec. 1816, subd. 5) ; taken
literally, a clear invasion of the judicial function.    In the
*Kiley Case,* as now, I was constrained to give the legislature
credit for intending just what it said, and to hold that, since
it exceeded its power in so invading the judicial field, and
would doubtless not have passed the act at all, independently
of such invasion, the whole act was unconstitutional.    What
the law is, what it has been, the meaning of legal terms, what
constitutes a question of law and what constitutes a question
of fact for a jury, and whether there is the latter or not, and
when a controversy should be submitted to a jury as involv-
ing disputed matters of fact and when it should not; are all
judicial questions with which the legislature has nothing to
do under the constitution.    Those principles are elementary.
A failure to firmly maintain them would be treason to the
paramount written law.    That the lawmaking power would
considerately desire not to have them maintained, or that it
would fail to award proper merit for their strict maintenance,
I would not think for a moment.    However, the fact, as seems
to the writer, that those principles were overlooked, as said
in my independent opinion in the *Kiley Case,* brings into
action as applicable, to some extent, to the legislation, the
rule that when a court reaches a conclusion as to a matter of
fact under a misconception of the law, or by overlooking it
altogether, the ordinary presumption as to its correctness
does not obtain.

There was no division in the *Kiley Case,* as I understand it, as to the validity of the law, taking it as it reads, and there probably would not be now. It was saved then, as in the case at hand it is to some extent now, by reading out of it, by rules of construction, a meaning which I cannot discover, applying such rules as I understand them, particularly the paramount one, that until there is uncertainty of sense there is no room for construction.

In now dealing with the act in a different situation than in the *Kiley Case,* it is more evident than ever that either the commonest principles of the law of negligence, intrenched in our jurisprudence, were overlooked, or there was a purpose to entirely change them. In reaching this conclusion I proceed thereto, all the time trying to get the legislative meaning out of the law, rather than to put such meaning into it, or a meaning which will sustain it.

Now, in one aspect of the case, whether the trial court was right in holding that, on the evidence, there was no jury question as to whether the act of the appellant contributed, directly, less than that of the engineer of the passenger train, to produce the accident, depends on the meaning of the law. In my opinion, certainly, if the language of the legislative questions is to be taken literally, there was no jury question, as the learned circuit judge held. But it is said that it is not to be so taken.

Possibly the purpose of the legislature was to adopt, somewhat, the principles of comparative negligence. On such principles, there was room in the evidence, perhaps, to say that one of the negligent individuals was in greater fault than the other. But how can we say such was the purpose? Comparative negligence, generally speaking, contemplates degrees of fault and responsibility on the party guilty of the highest degree thereof. There is no such idea of comparative negligence in the act in question.

In the published law, in large black letters, at the begin-

ning of sec. 1816, subd. 4, we read the words "Comparative negligence," but those words were not in the act as passed. They have been added by the person who happened to be employed to prepare the law for publication. Whether he was layman or lawyer we do not know. Though the editor chose to characterize the section as dealing with comparative negligence, when we read subd. 2 and subd. 3, which precedes it, we see comparative fault is not dealt with at all, nor proximate cause, as the same is understood in the law of negligence. Only comparative direct effects seem to have been in the legislative mind. Responsibility is not made to depend on fault in its proximate relation to consequences. Under the law, as it reads, there may be want of ordinary care, to any degree, yet, unless it directly produces the result complained of, there is no liability. Thus leaving out of view the numerous situations where there may be responsible fault by the rules of the common law, though not producing, directly, the injury at all; and making direct agency in producing the result the test of responsibility, in cases where the elements of proximate cause, which by the ordinary law, and the law of reason, are essential to responsibility, do not exist at all.

Subd. 3 requires the court to ask the jury whether the defendant was guilty of negligence directly contributing to the injury. What does that mean? Literally, as indicated, it means, was the defendant guilty of any negligence which contributed, in a physical sense, to produce the injury. Want of ordinary care is not, necessarily, within the meaning at all, nor the essential elements of proximate cause. All that is required to call 'for an affirmative answer to the question, is some negligence, however slight, and some consequent direct effect in producing the injury. These observations apply likewise to the legislative question required to be submitted as to the plaintiff's fault.

That the legislature intended to provide, as above suggested, hardly seems probable, but nothing else, in my judgment, can be read out of the act.

It seems that, because of impatience with the doctrine of proximate cause, which has been such an important element in the law of negligence in England and this country for generations, and impatience with the common distinction between mere negligence and want of ordinary care, it was thought to rid the law of those matters, so abstruse to laymen, but so very plain to the trained lawyer, and make any degree of negligence of a person, whether of the dignity of the want of ordinary care or not, and any degree of direct physical causation, whether characterized by the element of natural and probable result, or that of reasonable anticipation of injuring another or not, sufficient for responsibility, even though the degree of real fault on the part of such other be much greater than that of such person, if it does not in greater degree, immediately cause the result.

The third question to be submitted under the act, clearly, it seems, must be read in connection with the other two; was the "negligence of the" plaintiff "slighter . . . *as a contributing cause* to the injury than that of the" defendant? It should be noted that the question is not, was the negligence of the plaintiff slighter and did it contribute in greater degree, etc.; but was it slighter . . . *as a contributing cause,* etc. Consistently with the first two questions, by necessary implication, "direct" should be read before "contributing." In other words, the inquiry required is, was the negligence of the plaintiff less than that of the defendant as a direct contributing cause of the injury? That plainly makes the comparison not between degrees of fault, but between degrees of direct physical production of the result. True, we must confess at every step, it is almost incomprehensible that the legislature could have intended any such result, but the law seems to read so very plain that I can see no way to deal with it other than by giving effect to it in its letter, so far as constitutional, or condemn it as void for uncertainty.

I do not overlook that subd. 4 provides that the plaintiff shall recover if defendant's negligence was greater and con-

tributed in a greater degree, etc., thus speaking of comparative degrees of fault as well as of direct interference to produce the result; but the questions required to be submitted are inconsistent therewith and are so precise that it seems they must be controlling.

Now, in the judgment of the court, in order to make the act of 1907 a sensible, workable, constitutional piece of legislation, it is compelled to add to the help thereto afforded in *Kiley v. C., M. & St. P. R. Co.* 138 Wis. 215, 119 N. W. 309, by holding, in the whole, that, when the legislature commanded the submission of certain questions on the subject of negligence, it did not intend to make them, necessarily, sufficient to settle the ultimate question of responsibility and could not, legitimately, prevent the submission of other questions necessary to fill out a case in that regard; and by further holding that the language of subd. 5: "In all cases under this act the question of negligence and contributory negligence shall be for the jury," must have added thereto, by necessary implication, something like this, when the facts in that regard are in such doubt that a jury on the evidence could reasonably find either way. Also the word "negligence," in each of the three legislative questions, must be read as, want of ordinary care, the word "directly" in the first two questions, must be read as proximately, and the words, "whether the negligence of the party so injured was slighter or greater as a contributing cause to the injury than that of the company," etc., read as, whether the want of ordinary care of the party injured was less and contributed less, proximately, to produce the injury than that of the company, etc., thus harmonizing the law with some rational idea of comparative negligence.

I cannot consent to the radical necessary changes of language indicated. I think it violates the plain intent of the act. Absurd almost, if not quite so, as the law is, viewed as I view it, I am constrained to believe that those who had to do with drafting it meant just what they said and nothing else.

I cannot convict them of having been so wanting in knowledge of legal principles, common even among laymen, as to have put words together as they did and yet intended the radically different meaning the court has ascribed to those words. I do not know of any instance of such changes from the literal sense of an enactment having been made in the name of judicial construction as have been made in this one. It seems to me the work has been one of reconstruction, which does less credit to the lawmaking power than would condemnation of the act altogether.

Looking at the act as I do, I cannot come to any other conclusion than the learned circuit judge did. Under the act, as I read it, the case had to turn on whether fault, as regards direct effects, regardless of degree otherwise, of the engineer, contributed, not proximately, with all elements that word implies, but directly in greater degree to produce the injury than like fault of the plaintiff likewise contributed. In other words, the question was, did defendant's fault, regardless of the quantum thereof, more than plaintiff's, at the instant of the collision, lend greater effectiveness, regardless of the elements of responsible causation as understood universally in the law of negligence, than did like fault on the part of plaintiff, to produce the result complained of. I think the members of the court would easily unite in saying that the evidence did not present any jury question on that subject; that when we come down to the instant of the injury, leaving out of view the degree of fault committed outside the period of time in which a collision was inevitable, the act of appellant was at least as promotive of the catastrophe as that of respondent.

The appellant knew the passenger train was nearly due and that it was necessary to go about his duty of setting out the special signals in such cases, in ample time for him to have performed that duty before such train entered the region of unavoidable danger. He neglected to do that without any

justification whatever. He heedlessly sat down in the caboose to take a lunch, even after considerable inexcusable delay. In short, he acted regardless of the imminent danger he was in. The engineer, at the worst, ran his train, mindful only of the special required indications of a train being in his way. If appellant, even after considerable inexcusable delay, had left his caboose, he would not have been injured. His being in the caboose without putting out the customary signals, and the engineer not running his train upon the theory that the men on the one ahead might neglect their duty, were the immediate causes of his injury. Respondent had, every reason to expect the passenger train, and that the engineer thereof would expect to be intercepted by the special signals required under the circumstances. The latter had no reason to expect the freight train would be in his way, barring accidents, and then not without the special signals being out to warn him. How can one say, facing these premises which seem to be very clear, that at the instant the passenger train entered the space, rendering the accident inevitable, the degree of reasonable anticipation of a personal injury happening to some one was greater from the standpoint of the engineer than from that of appellant? I cannot, in any view, get beyond this point and appreciate how the learned trial court could not.

The respondent moved for a rehearing. In support of the motion there was a brief by *Greene, Fairchild, North & Parker,* attorneys, and *C. H. Van Alstine,* of counsel; and in opposition thereto a brief by *Wigman, Martin & Martin.*

The motion was denied February 1, 1910.